CA No. 22-50170

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

   v.

CHRISTOPHER MARCEL ESQUEDA,

        Defendant-Appellant.

DC No. 8:20-cr-00155-JFW-2

---

**APPELLANT'S OPENING BRIEF**

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

HONORABLE JOHN F. WALTER
United States District Judge

CUAUHTEMOC ORTEGA
Federal Public Defender
WASEEM SALAHI
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
(213) 894-2854
(213) 894-0081 (Fax)
waseem_salahi@fd.org
Attorneys for Defendant-Appellant

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................. 1

II.  JURISDICTIONAL STATEMENT ..................................... 3

III.  CUSTODY STATUS ....................................................... 3

IV.  QUESTION PRESENTED ............................................... 3

V.  FACTUAL & PROCEDURAL HISTORY ........................... 4

    A.  Undercover law enforcement and a confidential informant go to Esqueda's motel room and secretly record him while inside. ....................................................... 4

    B.  Indictment and motion to suppress ....................... 6

    C.  Conditional plea and sentencing ........................... 7

VI.  STANDARD OF REVIEW ............................................... 7

VII.  SUMMARY OF ARGUMENT ......................................... 7

VIII.  ARGUMENT ................................................................. 9

    A.  A Fourth Amendment violation occurs when the police enter a constitutionally protected area and exceed consent. ........................................................ 9

    B.  The scope of consent is determined by common-law trespass doctrine and prevailing social norms. ................... 11

    C.  Esqueda's Fourth Amendment rights were violated. ........... 16

        1.  The motel room was a constitutionally protected space. ........................................................ 17

        2.  Esqueda gave consent to enter, not to record. .............. 19

# TABLE OF CONTENTS

**Page**

3. Common law and social norms establish that secretly recording is not within the scope of an invitation to enter. ......................................................23

D. Prior precedent has not addressed this issue of first impression. ..............................................................28

1. *On Lee* and *Lopez* did not address undercover recordings in living spaces or apply the current Fourth Amendment test. .............................................29

2. Older Ninth Circuit cases involving undercover recordings haven't applied the *Jardines* test, either. .35

E. This Court should not follow the Seventh Circuit's unreasoned decision in *Thompson*.......................................38

F. The district court's order suffered from the same flaws as *Thompson*. ..........................................................43

IX. CONCLUSION ........................................................................45

CERTIFICATE OF RELATED CASES ...............................................46

CERTIFICATE OF COMPLIANCE ....................................................47

TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Breard v. Alexandria,*
341 U.S. 622 (1951) ............................................................... 13, 14

*Carbo v. United States,*
314 F.2d 718 (9th Cir. 1963) ................................................. 35, 36, 37

*Collins v. Virginia,*
138 S. Ct. 1663 (2018) .................................................................. 16

*Democracy Partners v. Project Veritas Action Fund,*
285 F. Supp. 3d 109 (D.D.C. 2018) ............................................. 24

*Food Lion, Inc. v. Capital Cities/ABC, Inc.,*
194 F.3d 505 (4th Cir. 1999) ................................................. 23, 27, 32

*Georgia v. Randolph,*
547 U.S. 103 (2006) ..................................................................... 19

*Kyllo v. United States,*
533 U.S. 27 (2001) ..................................................................... 9, 44

*LaLonde v. Cnty. of Riverside,*
204 F.3d 947 (9th Cir. 2000) ..................................................... 1, 17

*Lopez v. United States,*
373 U.S. 427 (1963) ................................................................ *passim*

*Lozano v. Doe 1,*
591 F. Supp. 3d 700 (C.D. Cal. 2022) ........................................... 16

*McGuire v. United States,*
273 U.S. 95 (1927) ........................................................................ 30

*Med. Lab'y Mgmt. Consultants v. Am. Broad. Cos., Inc.,*
30 F. Supp. 2d 1182 (D. Ariz. 1998) ......................................... 24, 27

*Miller v. Gammie,*
335 F.3d 889 (9th Cir. 2003) ........................................................ 37

## TABLE OF AUTHORITIES

Page(s)

*Minnesota v. Carter*,
525 U.S. 83 (1998) .................................................. 18

*O'Connor v. Ortega*,
480 U.S. 709 (1987) ................................................ 31

*Patel v. City of Montclair*,
798 F.3d 895 (9th Cir. 2015) ...................................... 30, 31

*Pitts Sales, Inc. v. King World Prods., Inc.*,
383 F. Supp. 2d 1354 (S.D. Fla. 2005) ............................. 25, 27

*Planned Parenthood Fed. of Am. v. Newman*,
No. 20-16068, 2022 WL 13613963 (9th Cir. Oct. 21, 2022) ... 23, 24, 27

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
214 F. Supp. 3d 808 (N.D. Cal. 2016) ............................. 24, 27

*Rathbun v. United States*,
355 U.S. 107 (1957) ................................................ 34

*Silverman v. United States*,
365 U.S. 505 (1961) ................................................ 17

*Smith v. Maryland*,
442 U.S. 735 (1979) ................................................ 34

*Stoner v. State of Cal.*,
376 U.S. 483 (1964) ............................................... 17, 36

*Todisco v. United States*,
298 F.2d 208 (9th Cir. 1961) ..................................... 35, 36, 37

*Turnbull v. Am. Broad. Cos.*,
No. 03-cv-3554-SJO (FMOX), 2004 WL 2924590 (C.D. Cal. Aug. 9, 2004) ....................................................... 25, 27

*United States v. Bain*,
874 F.3d 1 (1st Cir. 2017) ........................................ 16

iv

## TABLE OF AUTHORITIES

**Page(s)**

*United States v. Bosse,*
    898 F.2d 113 (9th Cir. 1990)................................................ 20, 21, 22

*United States v. Bramble,*
    103 F.3d 1475 (9th Cir. 1996)...................................................... 20, 21

*United States v. Brathwaite,*
    458 F.3d 376 (5th Cir. 2006) ............................................................... 19

*United States v. Craighead,*
    539 F.3d 1073 (9th Cir. 2008) ........................................................ 1, 17

*United States v. Davis,*
    326 F.3d 361 (2d Cir. 2003) ............................................................... 19

*United States v. Dixon,*
    984 F.3d 814 (9th Cir. 2020)...................................................... 11, 20, 37

*United States v. Jardines,*
    569 U.S. 1 (2013).................................................................... *passim*

*United States v. Jones,*
    565 U.S. 400 (2012).................................................................. *passim*

*United States v. Karo,*
    468 U.S. 705 (1984).................................................................... 40, 41

*United States v. Knotts,*
    460 U.S. 276 (1983) ......................................................................... 40

*United States v. Lundin,*
    817 F.3d 1151 (9th Cir. 2016)..................................................... *passim*

*United States v. On Lee,*
    343 U.S. 747 (1952)................................................................. *passim*

*United States v. Scott,*
    705 F.3d 410 (9th Cir. 2012)............................................................... 7

## TABLE OF AUTHORITIES

**Page(s)**

*United States v. Smith,*
  252 F. Supp. 3d 1033 (D. Nev. 2017) ................................................. 16

*United States v. Taketa,*
  923 F.2d 665 (9th Cir. 1991) ............................................................ 27

*United States v. Thompson,*
  811 F.3d 944 (7th Cir. 2016) ..................................................... *passim*

*United States v. Wahchumwah,*
  710 F.3d 862 (9th Cir. 2013) ................................................ 19, 20, 34

*United States v. White,*
  401 U.S. 745 (1971) ......................................................................... 34

*United States v. Winsor,*
  846 F.2d 1569 (9th Cir. 1988) .......................................................... 18

*Whalen v. McMullen,*
  907 F.3d 1139 (9th Cir. 2018) ................................................ 21, 23, 42

**State Cases**

*Copeland v. Hubbard Broad., Inc.,*
  526 N.W.2d 402 (Minn. Ct. App. 1995) ............................................ 26

*Hervatin v. Knickerbocker,*
  No. B130572, 2000 WL 35393280 (Cal. Ct. App. Aug. 21,
  2000) ............................................................................................... 25

**Federal Constitution**

U.S. Const. amend. IV ................................................................. *passim*

**Federal Statutes**

18 U.S.C. § 922 .................................................................................. 6

18 U.S.C. § 3231 ................................................................................ 3

## TABLE OF AUTHORITIES

**Page(s)**

28 U.S.C. § 1291 ....................................................................... 3

42 U.S.C. § 1983 ..................................................................... 22

47 U.S.C. § 605 ................................................................ 29, 30

## Other Authorities

Bryan A. Garner, et. al, THE LAW OF JUDICIAL PRECEDENT
(2016) ............................................................................. 36, 43

Dan B. Dobbs, et. al, *The Law of Torts* § 108 (2d ed.) ............................ 26

*Entick v. Carrington*, 2 Wils. K.B. 275, 291, 95 Eng. Rep. 807
(K.B. 1765) .......................................................... 11, 12, 13

Restatement (First) of Torts § 167 (1934) ................................. 14

Thomas M. Cooley & D. Avery Haggard, 2 A Treatise on the
Law of Torts, or the Wrongs Which Arise Independently of
Contract § 248 (4th ed. 1932) .......................................... 14

## I.  INTRODUCTION

This case is about whether undercover government agents who have been invited into one's living space—the most "sacrosanct" and "constitutionally protected place on earth"—can secretly record the occupants without a warrant once inside.[1]  The answer is no.

Over the last decade, the Supreme Court has clarified that, under the Fourth Amendment, certain property rights limit the government's conduct, regardless of whether a reasonable expectation of privacy exists.  *See United States v. Jones*, 565 U.S. 400 (2012); *United States v. Jardines*, 569 U.S. 1 (2013).  In particular, *Jardines* held that when law enforcement officers enter a constitutionally protected area, like a living space, their conduct is sharply circumscribed, and if they exceed the implicit "license," or consent, that the occupant gives them, they have conducted a search in violation of the Fourth Amendment.  To determine the scope of an implied license, courts must look to common-law trespass jurisprudence, prevailing social norms, and the officers' subjective purpose.

---

[1] *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 954 (9th Cir. 2000) ("sacrosanct"); *United States v. Craighead*, 539 F.3d 1073, 1083 (9th Cir. 2008) ("on earth").

In this case, appellant Christopher Marcel Esqueda was living in a motel room when two undercover agents and a confidential informant entered it and purchased a firearm from him. Unbeknownst to Esqueda, they were all equipped with audio- and video-recording devices and secretly recorded him while inside his living space. That was unconstitutional. Courts have overwhelmingly held that surreptitious recordings on private property, even for invited guests, exceeds the implied license granted to a guest. In fact, had the undercover agents been undercover journalists or private citizens, and had Esqueda sued for trespass, Esqueda would have prevailed under the great weight of authorities that have addressed this issue. That is because social norms do not permit a guest to surreptitiously record while on someone's private property.

In denying Esqueda's motion to suppress, the district court completely ignored *Jardines*'s scope-of-consent test. Instead, it latched onto old and inapplicable Supreme Court precedent and poorly reasoned out-of-Circuit authority. This Court should reverse and remand.

2

## II. Jurisdictional Statement

The district court had jurisdiction of this criminal case under 18 U.S.C. § 3231. On August 8, 2022, the district court entered a final judgment of conviction sentencing Esqueda to 24 months' imprisonment and three years of supervised release. ER-4. On the same day, Esqueda filed a timely notice of appeal. ER-165. This Court has jurisdiction under 28 U.S.C. § 1291.

## III. Custody Status

Esqueda served his prison sentence and, according to the Bureau of Prisons, was released on December 29, 2022.

## IV. Question Presented

Does the Fourth Amendment permit undercover police—who cannot "do[] . . . more than any private citizen might do," *United States v. Lundin*, 817 F.3d 1151, 1158–59 (9th Cir. 2016) (quotation marks omitted)—to enter one's living space and secretly videotape their interactions without a warrant while inside? Or does such conduct exceed the implied license that an invited guest enjoys and thus violate the Fourth Amendment?

## V. Factual & Procedural History

**A. Undercover law enforcement and a confidential informant go to Esqueda's motel room and secretly record him while inside.**

In January 2020, Esqueda was homeless and living in a motel room at the Valencia Inn, located in Anaheim, California. ER-35–36, 39, 51, 55. He had paid half the room's cost to stay there for three weeks. ER-39, 51. Esqueda was staying in Room 302. *Ids.*

Meanwhile, in that same month, a confidential informant and undercover agent for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) began investigating Esqueda's co-defendant, Daniel Alvarado. ER-36. The informant and ATF agent bought a revolver and one-half pound of methamphetamine from Alvarado in a separate room at the Valencia Inn, Room 352. *Id.* Esqueda was not involved in this transaction. *Id.*

After that purchase, and during the next eleven days, the informant and undercover agent communicated with Alvarado to purchase two more firearms and one pound of methamphetamine. ER-36–37. Esqueda was not involved in these communications. *See* ER-37.

On January 22, 2020, Alvarado instructed the undercover agent to meet him at the same motel but instead directed them to Esqueda's room, Room 302. *Id.* Later that afternoon, the informant, accompanied by an undercover ATF agent and an undercover law enforcement officer with the Costa Mesa Police Department, arrived at the room (collectively, the "undercover agents" or "agents"). *Id.*; ER-137. Alvarado let them inside. *Id.*

When the undercover agents entered, they saw Esqueda for the first time. ER-137–38. They had not, up until that point, known of his existence. *Id.* Alvarado sold the agents one pound of methamphetamine and a pistol. ER-38. After one agent inquired about another firearm Alvarado had mentioned, Alvarado asked Esqueda to retrieve it. *Id.* Esqueda pulled the firearm from his person and handed it to one of the agents. *Id.*

All three undercover agents surreptitiously videotaped the interaction. ER-39. Those recordings depict Esqueda and the interior of his motel room, and capture the agents' conversations with Esqueda and Alvarado. *Id.* Esqueda did not consent to the agents recording

5

while inside his room.  *Id.*  The government did not identify Esqueda until after they left.  ER-140.[2]

## B.    Indictment and motion to suppress

In October 2020, a federal grand jury indicted Esqueda for possessing a firearm on January 9, 2020, in violation of 18 U.S.C. § 922(g), after having previously been convicted of at least one prior felony.  ER-155.

Esqueda moved to suppress the audio- and video-recordings, and all fruits obtained therefrom, arguing that the government's decision to secretly record him while in his living space exceeded the scope of implied consent and caused a trespass in violation of the Fourth Amendment.  ER-93–154 (Opening Motion); ER-58–69 (Reply); ER-50–51 (Corrected Declaration); ER-52–57 (Supplemental Exhibit).  The government opposed.  ER-70–90.  In addition to contesting Esqueda on the merits, the government argued that Esqueda lacked standing, but it did not submit any proof challenging Esqueda's assertion that he was

---

[2] The record remains unclear about whether the agents used or otherwise reviewed the recordings to later identify Esqueda.

living in the motel room or otherwise lacked standing. ER-78–79. The government also requested an evidentiary hearing. ER-90.

The district court denied the government's request for an evidentiary hearing and held that Esqueda had standing to bring a Fourth Amendment challenge. ER-34–36. Turning to the merits, the district court concluded no Fourth Amendment violation occurred and denied the motion. ER-36–46.

## C.    Conditional plea and sentencing

Esqueda pled guilty to the firearm count pursuant to a conditional plea agreement, which preserved his right to appeal the district court's denial of his motion to suppress. ER-11 ¶ 3. The district court sentenced Esqueda to 24 months' imprisonment and three years of supervised release. ER-4. Esqueda timely appealed. ER-165.

## VI. STANDARD OF REVIEW

This Court reviews de novo the lawfulness of a search. *United States v. Scott*, 705 F.3d 410, 414–15 (9th Cir. 2012). "The district court's underlying findings of fact are reviewed for clear error." *Id.*

## VII. SUMMARY OF ARGUMENT

This Court must decide whether undercover agents who have been invited into one's living space can secretly record the person without a

7

warrant while inside.  Under recent Supreme Court decisions applying trespass doctrine to the Fourth Amendment, the answer to that question is no — such conduct constitutes a search in violation of the Fourth Amendment.

*Jardines* held that once law enforcement officers enter a constitutionally protected area, their conduct is sharply circumscribed and cannot exceed the scope of implied consent.  It further held that, to determine the scope of implied consent, courts must look to common-law trespass jurisprudence and prevailing social norms.  Here, both demonstrate that surreptitiously taking audio- and video-recordings while in someone's living space exceeds the scope of implied consent.  That conclusion is supported not only by deeply held social norms, but also a legion of civil trespass cases and other legal authorities holding that such conduct exceeds consent.

Neither the Supreme Court nor the Ninth Circuit has decided the precise question at issue here, though the Supreme Court upheld undercover recordings in business settings in two older cases long pre-dating current Fourth Amendment jurisprudence — *United States v. On Lee*, 343 U.S. 747 (1952), and *Lopez v. United States*, 373 U.S. 427

8

(1963).  Those cases were legally and factually distinguishable,

however, because neither occurred in a living space, as here, nor applied

the scope-of-consent test, which *Jardines* now requires.  Since *Jardines*,

only one circuit court has addressed the issue at hand, *see United States

v. Thompson*, 811 F.3d 944 (7th Cir. 2016), but that case completely

ignored *Jardines*'s scope-of-consent test, is not well reasoned, and has

no persuasive value.  The district court erred by ignoring *Jardines* and

relying instead on that faulty out-of-circuit case.

## VIII.   ARGUMENT

### A.   A Fourth Amendment violation occurs when the police enter a constitutionally protected area and exceed consent.

Courts must apply two alternative tests to evaluate whether

conduct constitutes a "search" under the Fourth Amendment.  Under

the *Jones* test, a search occurs when the government physically invades

property without consent to gather information.  *United States v. Jones*,

565 U.S. 400, 404–05 (2012).  Under the *Katz* test, "a Fourth

Amendment search occurs when the government violates a subjective

expectation of privacy that society recognizes as reasonable."  *Kyllo v.

United States*, 533 U.S. 27, 33 (2001) (citing *Katz v. United States*, 389

9

U.S. 347, 361 (1967) (Harlan, J., concurring)). The Fourth Amendment covers conduct that falls under either of those tests. That is, a search occurs *either* when the government physically invades one's property to gather information (*Jones*) *or* when the government violates a subjective expectation of privacy that society recognizes as reasonable (*Katz*). *See Jones*, 565 U.S. at 409 ("[T]he *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test."). Thus, a trespass triggers Fourth Amendment protection even if the intrusion does not violate a reasonable expectation of privacy under *Katz*. *Id.* at 406 ("Fourth Amendment rights do not rise or fall with the *Katz* formulation.").

In *Jones*, for instance, the police attached a global positioning system (GPS) device under the defendant's car to follow his whereabouts for four weeks. *Id.* at 402–03. The government argued this conduct did not qualify as a Fourth Amendment search because the defendant had exposed his whereabouts on public streets to everyone and therefore enjoyed no reasonable expectation of privacy. *Id.* at 406. The Supreme Court, however, set aside the privacy argument and relied upon a common-law trespass test. *Id.* at 404–05. By placing a GPS

device on the defendant's car, the police trespassed his personal

property. *Id.* The Court emphasized that a trespass used to obtain

information constitutes a Fourth Amendment search, regardless of

whether the conduct also invades a reasonable expectation of privacy

under *Katz.* *Id.*

Critically, the Supreme Court also held that a trespass triggers

Fourth Amendment protection no matter how slight it is. *See id.*

(placing a GPS device on the undercarriage of a car constitutes a

search); *see also Entick v. Carrington*, 2 Wils. K.B. 275, 291, 95 Eng.

Rep. 807, 817 (K.B. 1765) ("By the laws of England, every invasion of

private property, be it ever so minute, is a trespass."); *United States v.*

*Lundin*, 817 F.3d 1151, 1158–60 (9th Cir. 2016) (holding that even a

knock on the door can constitute a search under certain circumstances);

*United States v. Dixon*, 984 F.3d 814, 820 (9th Cir. 2020) ("[T]he

insertion of the key into the minivan's lock constituted a search within

the meaning of the Fourth Amendment.").

## B. The scope of consent is determined by common-law trespass doctrine and prevailing social norms.

Soon after *Jones*, in *Florida v. Jardines*, 569 U.S. 1 (2013), the

Supreme Court again addressed physical intrusion, examining a

situation in which officers have some implied consent to be on the property but exceed the license that that consent affords them. In *Jardines*, law enforcement received a tip that the defendant had been running a marijuana grow operation at his home. *Id.* at 3. Officers then brought a drug-sniffing dog onto the front porch of the home, and—after the dog alerted to narcotics—obtained a search warrant, which revealed marijuana plants growing inside. *Id.* at 3–4.

The Supreme Court held that the officers' conduct violated the Fourth Amendment. The Court explained that once an officer enters a "constitutionally protected area," such as the curtilage of a home, the "officer's leave to gather information is sharply circumscribed." *Id.* at 7. This rule, the Court noted, emerged in the common law and well before this Nation's Founding: "Our law holds the property of every man so sacred, that no man can set his foot upon his neighbor's close without his leave." *Id.* at 7–8 (quoting *Entick*, 2 Wils. K.B. at 291, 95 Eng. Rep. at 817) (brackets removed). Applying that principle, the Court looked to whether the officers had "license," or consent, to bring dogs into the defendant's curtilage and sniff for drugs. *Id.* at 8. "A license," the Court explained, "may be implied from the habits of the country. . . ."

12

*Id.* (quoting *McKee v. Gratz*, 260 U.S. 127, 136 (1922)). "Habits of the country," in turn, can be discerned by looking to common-law trespass doctrine and "background social norms." *Id.* at 8–9. Quoting its prior decision in *Breard v. Alexandria*, 341 U.S. 622 (1951), the Court explained that "the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." 569 U.S. at 8 (quoting *Breard*, 341 U.S. at 626). Thus, visitors, like a trick-or-treater or Girl Scout, have "implicit license"—and therefore do not commit a trespass—when they "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent an invitation to linger longer) leave." *Id.* Likewise, a police officer, just like any private citizen, "may approach a home and knock," even without a warrant. *Id.* (citing *Kentucky v. King*, 563 U.S. 452, 469 (2011)).[3]

---

[3] As in *Jardines*, the Supreme Court in *Jones* also looked to the common law to assess the Fourth Amendment violation: the Court relied on the common law of trespass, quoted from *Entick*'s language on trespass from 1765, and expressly used the phrase "common-law trespassory test." *Jones*, 565 U.S. at 405, 409. And *Jardines*, though disavowing strict reliance on the common law of England, 569 U.S. at 8 (citing *McKee*, 260 U.S. at 136), borrowed understandings of trespass and implied licenses from its prior decision in *Breard*, which, in turn,

But while our society recognizes an implied license to knock on someone's door, "introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else." *Id.* at 9. "There is no customary invitation to do *that*," the Court emphasized. *Id.* In other words, "the background social norms that invite a visitor to the front door do not invite him there to conduct a search." *Id.* The Court thus held that by entering the defendant's curtilage with a dog to search for drugs, the officers exceeded the scope of implied consent and committed a search in violation of the Fourth Amendment. *Id.* at 11.

In reaching this conclusion, *Jardines* identified three important limitations on government conduct. The first limitation is geographical: officers may enter constitutionally protected areas only if they have express or implied permission to do so. *Id.* at 8–9. The second limitation is behavioral: even if an officer has permission to be in a

---

cited several treatises on the law of trespass and implied licenses, *id.* (quoting *Breard*, 341 U.S. at 626 (citing, in note 1, Restatement (First) of Torts § 167 (1934); Thomas M. Cooley & D. Avery Haggard, 2 A Treatise on the Law of Torts, or the Wrongs Which Arise Independently of Contract § 248 (4th ed. 1932)). *Jardines* also looked to modern trespass concepts in its application. *Id.* at 9.

specific area, the officer's conduct in that area will constitute a search if the owner didn't permit the officer, either explicitly or implicitly, "to do *that*" conduct. *Id.* at 9. The third limitation is on intent: "The scope of a license—express or implied—is limited not only to a particular area but also to a *specific purpose*," the Court stated. *Id.* (emphasis added). In other words, the officers' subjective motivations are relevant to determine whether their conduct exceeded consent. *Id.*; *see also Lundin*, 817 F.3d at 1160 (explaining that, "[a]fter *Jardines*, it is clear that . . . [Fourth Amendment] exception[s] depend[] at least in part on an officer's subjective intent").

Since *Jardines*, many courts have applied the scope-of-consent test and found Fourth Amendment violations where law enforcement entered a constitutionally protected area and committed acts or harbored purposes that were socially aberrant. For instance, in *Lundin*, this Court decided that even a *knock on a door*—a paradigmatic example of presumptively acceptable behavior—can constitute a Fourth Amendment search if it happened at an inappropriate time and with an inappropriate purpose. 817 F.3d at 1158–60 (holding 4 a.m. knock-and-talk with purpose of arresting

occupant exceeded scope of implied consent because "the officers . . . acted for a purpose that virtually no resident would willingly accept"); *see also Collins v. Virginia*, 138 S. Ct. 1663, 1671–72 (2018) (holding that walking onto driveway with purpose of observing criminal evidence is a trespass violating the Fourth Amendment); *United States v. Smith*, 252 F. Supp. 3d 1033, 1039 (D. Nev. 2017) ("But even if [the officer] had permission to walk onto [the defendant's] porch to talk, her entry was still unconstitutional because she exceeded the scope of that permission by entering not just to talk, but also with an improper intent to arrest."); *United States v. Bain*, 874 F.3d 1, 15 (1st Cir. 2017) (holding that testing keys on a door lock exceeded the "implicit license" granted by a homeowner); *Lozano v. Doe 1*, 591 F. Supp. 3d 700, 712 (C.D. Cal. 2022) ("[N]othing in the implied license to have [a] consensual interaction suggests a visitor can restrict the movements of a homeowner next to his own home any more than she could force the resident to buy cookies or hand out candy.").

## C. Esqueda's Fourth Amendment rights were violated.

With the above legal principles in mind, the government violated Esqueda's Fourth Amendment rights. By entering Esqueda's motel

room, the undercover agents and informant entered a constitutionally protected area and were thus restricted to the scope of implied consent while inside. Esqueda's invitation into his living space, however, did not include consent to record. Both civil trespass cases and deeply held social norms support this conclusion.

### 1. The motel room was a constitutionally protected space.

The abode, even a temporary one, enjoys the strongest constitutional protections. "[W]hen it comes to the Fourth Amendment, the home is the first among equals." *Jardines*, 569 U.S. at 6. At the "very core" of the Fourth Amendment "stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961); *see also LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 954 (9th Cir. 2000) (describing the home as "the most sacrosanct domain"); *United States v. Craighead*, 539 F.3d 1073, 1083 (9th Cir. 2008) (describing home as the "most constitutionally protected place on earth").

These strong protections for the home apply equally to temporary living spaces, such as a motel room, too. *Stoner v. State of Cal.*, 376

17

U.S. 483, 490 (1964) ("No less than a tenant of a house, or the occupant of a room in a boarding house, a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures.") (citations omitted); *see also United States v. Winsor*, 846 F.2d 1569, 1572 n.2 (9th Cir. 1988) ("The law is clear that [a defendant's] Fourth Amendment rights would [be] no less protected had [the defendant] been an overnight guest of the hotel."); *Minnesota v. Carter*, 525 U.S. 83, 95–96 (1998) (Scalia, J., concurring) ("Of course this is not to say that the Fourth Amendment protects only the Lord of the Manor who holds his estate in fee simple. People call a house 'their' home when legal title is in the bank, when they rent it, and even when they merely occupy it rent free . . . .").

By entering Esqueda's motel room, the undercover agents entered a constitutionally protected area entitled to the strongest protections that exist under the Fourth Amendment. Thus, while inside, their conduct was "sharply circumscribed" to the implicit license granted to them, and any conduct that exceeded license constituted a Fourth Amendment violation. *Jardines*, 569 U.S. at 7. This Court must therefore look to common-law trespass doctrine, "background social

18

norms," and the officers' "specific purpose" to determine whether they exceeded the scope of implied consent. *Id.* at 8–9; *see also Lundin*, 817 F.3d at 1158–59 ("To qualify for the [implicit license] exception, the government must demonstrate that the officers conformed to the habits of the country, by doing no more than any private citizen might do.") (cleaned up); *Georgia v. Randolph*, 547 U.S. 103, 111 (2006) ("The constant element in assessing Fourth Amendment reasonableness in the consent cases, then, is the great significance given to widely shared social expectations, which are naturally enough influenced by the law of property, but not controlled by its rules."). Looking to those factors, it is clear that the undercover agents were not entitled to surreptitiously record Esqueda while inside his motel room.

### 2. Esqueda gave consent to enter, not to record.

Whether undercover agents exceed the scope of consent when they secretly record a person in his or her living space under the *Jones–Jardines* trespass test is a question of first impression in this Court.[4]  A

---

[4] In contrast, numerous courts have analyzed whether such conduct violates the *Katz* reasonable-expectations-of-privacy test, and have held that it does not. *See, e.g., United States v. Wahchumwah*, 710 F.3d 862, 866–68 (9th Cir. 2013); *United States v. Brathwaite*, 458 F.3d 376, 379–81 (5th Cir. 2006); *United States v. Davis*, 326 F.3d 361, 364–

19

faithful application of this test confirms that the undercover agents

violated Esqueda's Fourth Amendment rights when they entered his

living space and surreptitiously took audio- and video-recordings.

First, the fact that the undercover agents were invited into

Esqueda's motel room does not resolve the question. Such an invitation

does not provide the agents with a free-for-all license to do as they

please. To the contrary, the agents' conduct and purpose remain

"sharply circumscribed" after entering one's dwelling. *Jardines*, 569

U.S. at 7.[5] As this Court has similarly recognized, an undercover agent

---

67 (2d Cir. 2003). These outcomes, which were determined under a
*Katz* analysis, however, do not govern the outcome under the *Jones–
Jardines* test here. *See Jones*, 565 U.S. at 406; *Jardines*, 569 U.S. at
10–11; *see also Dixon*, 984 F.3d at 819–20. In fact, this Court expressly
declined to address this issue under a trespass theory when it was
raised in an amicus brief in *Wahchumwah*. 710 F.3d at 868 n.2.

[5] The *Jones–Jardines* test focuses on whether law enforcement
officers engage in activities beyond the scope of consent in a
constitutionally protected space, and their purpose; it does not turn on
whether identity alone is misrepresented to enter that space. Thus,
this Court's precedent holding that undercover agents may
misrepresent their identities to obtain consent to enter a person's home
is not at issue. *See, e.g., United States v. Bramble*, 103 F.3d 1475, 1478
(9th Cir. 1996) ("It is well-settled that undercover agents may
misrepresent their identity to obtain consent to entry."); *United States
v. Bosse*, 898 F.2d 113, 115 (9th Cir. 1990) ("An officer may, consistent
with the fourth amendment, conceal his or her identity to obtain an
invitation to enter a suspect's home."). That is because the undercover

who obtains consent to enter a home cannot "exceed the scope of his invitation while inside the home." *Whalen v. McMullen*, 907 F.3d 1139, 1147 (9th Cir. 2018). Exceeding consent, as this Court put it in *Bosse*, "cannot be so justified." *See Bosse*, 898 F.2d at 115 n.1; *see also Bramble*, 103 F.3d at 1478–79 ("Our holding does not authorize police to go beyond those areas consented to or to conduct general searches without first satisfying the ordinary requirements of consent, a warrant, or exigent circumstances which excuse the failure to obtain a warrant.").

Second, consent to enter does not carry with it consent to record, as this Court observed in *Whalen*. In *Whalen*, an officer was investigating the plaintiff for potential social security fraud. 907 F.3d at 1143–45. The officer went to the plaintiff's home and, instead of revealing the true purpose of his visit, told her he was investigating an identity theft ring. *Id.* at 1144. Based on this false representation, the plaintiff allowed the officer to enter her home, and, while inside, the officer activated two hidden devices that videorecorded several items

---

agents didn't have permission to record, regardless of whether they were in disguise.

that were later used to deny her social security disability application. *Id.*

The plaintiff brought suit under 42 U.S.C. § 1983, alleging that the officer's entry into her home violated the Fourth Amendment because he lied about his reasons for wanting to speak with her. *Id.* at 1145. This Court agreed. *Id.* at 1147. It applied *Jardines* to address whether the officer's investigation "was 'unlicensed' or without consent." *Id.* (citing *Jardines*, 569 U.S. at 7–8). This Court ultimately concluded that the initial entry constituted a trespass because the officer, while presenting himself as a government agent, lied to gain entry into the home and, in doing so, sullied the government's credibility. *Id.* (admonishing the officer for "invoking the private individual's trust in his government, only to betray that trust") (quoting *Bosse*, 898 F.2d at 115). But this Court also made special mention of the video surveillance, too: "[The officer] did not have consent to be in the home for the purposes of his visit," the court stated. *Id.* at 1150. "*And,*" this Court added, "he did not have consent—under any terms—to videotape [the plaintiff] or her home." *Id.* at 1151 (emphasis added). Thus, at a

22

minimum, this Court recognized that an invitation to enter a home does not, "under any terms," permit the invitee to record while inside. *Id.*

### 3. Common law and social norms establish that secretly recording is not within the scope of an invitation to enter.

Many authorities have echoed *Whalen*'s distinction between consent to enter and consent to record. For instance, the Fourth Circuit recognized this distinction explicitly in *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505 (4th Cir. 1999). Although the court held that journalists did not commit a trespass simply by misrepresenting their identities to obtain jobs at a supermarket, the court did affirm a trespass finding because the journalists secretly "film[ed] in non-public areas" while inside—and thus committed "an act in excess" of their license. *Id.* at 518.

Likewise, this Court recently affirmed, in an unpublished decision, the district court's grant of a plaintiff's motion for summary judgment on a trespass claim because the defendants had "exceeded the scope of their consent to enter [the plaintiff's event space] . . . by surreptitiously recording [the plaintiff's] staff . . . ." *Planned Parenthood Fed. of Am. v. Newman*, No. 20-16068, 2022 WL 13613963,

at *2 (9th Cir. Oct. 21, 2022). Although this decision was reached based on contractual promises to maintain confidentiality, this Court at a minimum recognized that surreptitious recording constitutes a distinct act beyond mere entry. *See id.*

District courts nationwide have also confirmed that property owners do not implicitly consent to surreptitious videorecording on their property, even after consenting to entry. *See, e.g.*, *Med. Lab'y Mgmt. Consultants v. Am. Broad. Cos., Inc.*, 30 F. Supp. 2d 1182, 1204 (D. Ariz. 1998), *aff'd*, 306 F.3d 806 (9th Cir. 2002) (holding that undercover reporters committed trespass because the plaintiff "did not consent to any videotaping on his property"); *Democracy Partners v. Project Veritas Action Fund*, 285 F. Supp. 3d 109, 119 (D.D.C. 2018) (holding that plaintiff sufficiently stated a trespass claim, "even if [the invited guest's] misrepresentation does not vitiate plaintiffs' consent to her entry," by alleging that the individual "exceeded the scope of any consent by secretly recording conversations" while inside); *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 214 F. Supp. 3d 808, 834–35 (N.D. Cal. 2016), *aff'd,* 890 F.3d 828 (9th Cir. 2018), *amended,* 897 F.3d 1224 (9th Cir. 2018), and *aff'd,* 735 F. App'x 241 (9th

Cir. 2018) (holding that complaint adequately alleged trespass claim on the ground that the defendants "exceeded scope of the consent when they secretly filmed the proceedings"); *Pitts Sales, Inc. v. King World Prods., Inc.*, 383 F. Supp. 2d 1354, 1364–67 (S.D. Fla. 2005) (holding that although the plaintiff consented to an undercover television producer's entry on its property, a triable fact existed as to whether the producer, who secretly recorded business conversations for a television story, "exceeded [the plaintiff's] consent" to enter the property); *Turnbull v. Am. Broad. Cos.*, No. 03-cv-3554-SJO (FMOX), 2004 WL 2924590, at *15 (C.D. Cal. Aug. 19, 2004) (denying summary judgment and holding that, even if plaintiffs consented to undercover reporters' entry, a consent defense was ineffective "if the scope of consent [was] exceeded" by secretly videotaping).

State courts are in accord with these holdings, too. Courts, for example, have recognized that a trespass occurs when a party entering land by limited consent exceeds those limits by secretly recording. *See, e.g.*, *Hervatin v. Knickerbocker*, No. B130572, 2000 WL 35393280, at *13 (Cal. Ct. App. Aug. 21, 2000) (holding that although the plaintiff consented to the defendant to "enter onto her property for the limited

purposes of inspecting it for purchase," the plaintiff "did not consent . . . to [the defendant] using the occasion to secretly tape record their conversation"); *Copeland v. Hubbard Broad., Inc.*, 526 N.W.2d 402, 405 (Minn. Ct. App. 1995) (holding triable fact existed on a trespass claim against a broadcaster who secretly videotaped while inside plaintiff's home).

A leading treatise expresses an identical view. For instance, Dobbs' *Law of Torts* provides an apt example of how consent to entry does not include consent to surreptitious recordings:

> If I present myself to you as a student seeking to learn more about the legal profession, you might admit me to your office on the implicit condition or understanding that I am what I claim to be, and not, say, a television reporter with a hidden camera.

Dan B. Dobbs, et. al, *The Law of Torts* § 108 (2d ed.).

These authorities confirm our deeply held social norms: It is not a "habit of the country," or a widely shared social expectation, that a person might secretly videotape the interior of a person's living space after being invited to enter. *See Jardines*, 569 U.S. at 8. An invitation into the home might, for instance, imply a right to use the bathroom, to sit on the sofa, or to gaze at the bookshelf or the art on the walls. It

might even permit a glimpse into the refrigerator (but probably not the medicine cabinet). If the owner is celebrating his birthday, social norms might permit the partygoers to film; at the very least, when the camera is visible, consent might easily be implied from the circumstances. But entering with a hidden video camera—a "silent, unblinking lens," *United States v. Taketa*, 923 F.2d 665, 677 (9th Cir. 1991)—to capture everything within sight—and, specifically, to record the resident's misdeeds to be broadcast in court—far exceeds the implied scope of the invitation into one's home. Just as an ordinary homeowner does not expect someone to bring a dog to one's curtilage to sniff for drugs, *see Jardines*, 569 U.S. at 9, or to knock on the door at 4 a.m. to effect an arrest, *see Lundin*, 817 F.3d at 1158–60, a person does not expect someone to bring far more sophisticated equipment, like a concealed video camera, into his or her home to record. "There is no customary invitation to do *that*." *See Jardines*, 569 U.S. at 9.

This simple, commonsense proposition, championed in *Food Lion*, *Newman*, *Center for Medical Progress*, *Medical Laboratory Management*, *Turnbull*, and *Pitts Sales*, which involve places of business, applies even more forcefully when the violation occurs within

27

someone's living space, which enjoys the strongest constitutional protections under the Fourth Amendment. *See* Section VIII.C.1, above. Thus, although people cannot always predict the loyalties of an invited guest and might, in some circumstances, misplace their confidence in others, they do not forfeit the right to regulate conduct that occurs within their dwelling. That is a deeply rooted legal and cultural norm. By recording Esqueda inside his living space without his consent or a warrant, the government conducted a search in violation of the Fourth Amendment.

## D. Prior precedent has not addressed this issue of first impression.

*Jardines* sets forth the test that must be applied here and, under that test, suppression is required. *See* Sections VIII.A–C, above. Decades before *Jardines*, the Supreme Court and Ninth Circuit considered fact patterns involving surreptitious recordings and held there was no Fourth Amendment violation. Those cases did not, however, address the scope-of-consent test that *Jardines* now requires courts to apply. They therefore do not apply in this case, and, to the extent they suggest a different outcome than *Jardines*, have been superseded by its analysis.

28

1. ***On Lee* and *Lopez* did not address undercover recordings in living spaces or apply the current Fourth Amendment test.**

In *On Lee v. United States*, the Supreme Court addressed whether the Fourth Amendment protected a business owner from having his incriminating conversations with an undercover informant secretly transmitted by microphone to an eavesdropping agent. 343 U.S. 747 (1952). There, the defendant owned a laundromat, and the informant, an old acquaintance and former employee, entered and spoke to the defendant "while customers came and went." *Id.* at 749. Unbeknownst to the defendant, the informant was wearing a concealed microphone that transmitted the conversation to a nearby agent. *Id.* The defendant argued that the informant violated the Federal Communications Act, 47 U.S.C. § 605, by secretly transmitting the conversation to law enforcement,[6] and that this "unlawful conduct" vitiated consent and rendered the informant's entry a "trespass ab initio," a doctrine that holds that subsequent unlawful conduct can render an otherwise lawful entry a trespass from the outset. *Id.* at 750–52.

---

[6] The Court held that no such violation occurred. 343 U.S. at 754.

29

The Court rejected the defendant's contention, holding that it had already declined to apply the trespass ab initio doctrine in a prior case. *Id.* at 752 (citing *McGuire v. United States*, 273 U.S. 95, 98 (1927)).[7] The Court emphasized that the trespass ab initio doctrine is a "fiction" that existed only as a "rule of liability in civil actions" and that its "extension is not favored." *Id.* (quoting *McGuire*, 273 U.S. at 99). Thus, the Court concluded, even assuming the officers violated the Federal Communications Act, this so-called "unlawful conduct" did not "vitiate" consent through the trespass ab initio doctrine. *Id.*

There are at least two reasons *On Lee* has no bearing here. First, and critically, the recording in *On Lee* did not occur in a living space, as here, but rather in a business. *Id.* at 749. Unlike the public areas of a business, a residence is an enumerated place entitled to Fourth Amendment protection under a trespass theory. *See Patel v. City of*

---

[7] In *McGuire*, the defendants argued that the officers became trespassers ab initio, and thus violated the Fourth Amendment, after they unlawfully destroyed liquor they had seized pursuant to a warrant. 273 U.S. at 97. The Court held that, although destroying the liquor was "an illegal and oppressive act," the officers did not lose the protection that the otherwise lawful search warrant afforded them. *Id.* at 98. The Court did not address whether the officers conducted an unlawful search.

*Montclair*, 798 F.3d 895, 898–99 (9th Cir. 2015) (holding that publicly accessible areas of a motel business do not receive a trespass analysis under *Jones* because they are unenumerated); *see also id.* at 900 ("*Jones* establishes a default rule that a government intrusion with respect to the enumerated items of the Fourth Amendment, regardless of a defendant's reasonable expectation of privacy, will implicate the constitutional protection against unreasonable searches and seizures."); *Jones*, 565 U.S. at 953 (explaining why a technical trespass into an "open field" does not constitute a Fourth Amendment search because an open field, unlike a curtilage, is not an enumerated area under the Fourth Amendment).[8]

Second, *On Lee* did not address whether the informant violated the *scope* of the defendant's consent by wearing a microphone or whether social norms permit an invited guest to secretly record after entering a constitutionally protected area. *See* 343 U.S. at 750–53; *Jardines*, 569 U.S. at 8–9. The Court had no need to engage in this

---

[8] Businesses and offices can still of course receive Fourth Amendment protection under a *Katz* reasonable-expectation-of-privacy test. *See, e.g.*, *O'Connor v. Ortega*, 480 U.S. 709, 719 (1987).

inquiry: the defendant never raised the issue.[9]  Instead, he simply asked the Court to incorporate an unrelated civil doctrine into a Fourth Amendment analysis, which would have converted *any* illegal acts by the government into a *per se* Fourth Amendment violation.  *Id.* at 751–52.

For similar reasons, the Supreme Court's later decision in *Lopez v. United States* does not apply here, either.  373 U.S. 427, 437–39 (1963).  There, an Internal Revenue Service agent visited the defendant's office on suspicion that he had been illegally operating a cabaret without paying the requisite taxes.  *Id.* at 429.  After the defendant tried bribing the agent, the agent returned equipped with a recording device and pretended to be interested in receiving bribes.  *Id.* at 429–32.  The

---

[9] Even had *On Lee* analyzed whether the informant violated the laundromat owner's scope of consent, the scope of implied consent for what one might do at a laundromat, as customers freely "[come] and [go]," 343 U.S. at 749, differs greatly from what society permits an invited guest to do in a person's living space.  Customers indeed often record interactions with employees in the public area of a business, either to capture wrongdoing or to document the interaction, and those recordings might go viral, with or without the business owner's express consent.  But once an individual secretly records in a private area of the business, courts have found trespass violations.  *See, e.g.*, *Food Lion, Inc.*, 194 F.3d at 518.

defendant tried to suppress the recordings on the ground that the agent "gained access to [the defendant's] office by misrepresentation" and argued that "all evidence obtained in the office, *i.e.*, his conversation with [the defendant], was illegally 'seized.'" *Id.* at 437. The defendant did not, however, argue that the recording constituted a "search" because it exceeded the scope of consent.

The Court held no Fourth Amendment violation occurred. It explained that the agent did not "unlawful[ly] inva[de]" the defendant's office "simply because [the agent's] apparent willingness to accept a bribe was not real." *Id.* at 438. It further held that the agent did not violate the office's "privacy" by surreptitiously recording the conversation. *Id.*

Just like in *On Lee*, the Court in *Lopez* did not apply *Jardines*'s scope-of-consent test; it simply held that the agent's misrepresentation that he intended to take a bribe did not render the agent's initial entry unlawful. *Id.* Further, as in *On Lee*, the recordings did not take place in a living space, as here, but in an office, which is not an enumerated category deserving protection against physical intrusion under the Fourth Amendment. *Id.* And critically, although predating *Katz* by

four years, *Lopez* essentially involved a "privacy"—rather than trespass—analysis.  Not only did the Court use the term "privacy" expressly in holding that the recording was not unlawful, it also used *Katz*-like, assumption-of-risk rationale in its reasoning:  "[t]he only evidence obtained consisted of statements made by [the defendant] to [the agent], statements which [the defendant] *knew full well* could be used against him by [the agent] if he wished."  *Id.* (emphasis added).[10] Indeed, the Supreme Court has since treated *Lopez* as having been decided under an expectation-of-privacy rationale.  *See Smith v.*

---

[10] *Lopez*'s citation to *Rathbun v. United States*, 355 U.S. 107 (1957), further bolsters this point.  *Lopez*, 373 U.S. at 439 (citing *Rathbun*).  In *Rathbun*, the Court permitted, against statutory attack, an officer to testify about a phone call he overheard, where one party consented to the eavesdropping on the theory that "[e]ach party to a telephone conversation takes the risk that the other party . . . may allow another to overhear the conversation."  *Rathbun*, 355 U.S. at 111. The same rationale around "risk-taking" has been used to explain why secret recordings do not violate one's reasonable expectations of privacy under *Katz.  See, e.g., Wahchumwah*, 710 F.3d at 867 ("If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking and *whose trustworthiness the defendant necessarily risks*.") (quoting *United States v. White*, 401 U.S. 745, 751 (1971)) (emphasis added).

*Maryland*, 442 U.S. 735, 743–44 (1979) (citing *Lopez* for the proposition that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties").

### 2. Older Ninth Circuit cases involving undercover recordings haven't applied the *Jardines* test, either.

After *On Lee*—and before *Katz*, let alone *Jones* and *Jardines*—this Court similarly rejected Fourth Amendment challenges on similar fact patterns. Relying on *On Lee*, this Court held that the Fourth Amendment permitted informants to obtain consent to enter a defendant's space through false pretenses and then secretly record, and even applied that holding from the businesses at issue in *On Lee* and *Lopez* to a hotel room. *See, e.g.*, *Todisco v. United States*, 298 F.2d 208, 209–11 (9th Cir. 1961) (business); *Carbo v. United States*, 314 F.2d 718, 738 (9th Cir. 1963) (hotel room).

As in *On Lee* and *Lopez*, however, this Court did not consider the defendant's scope of consent, which *Jardines* has now identified as crucial to a trespass analysis. *Todisco* instead applied only a *Katz*-like test about reasonable expectations of privacy to uphold undercover recordings at the defendant's law office. *See Todisco*, 298 F.2d at 210

("The [Supreme Court's] principal concern in the eavesdropping cases is the protection of the *right of privacy*.") (emphasis added); *see also id.* ("The risk to which the non-consenting party is subjected is not really a wiretapping risk but the risk of betrayal by the other party who acquiesced in the tap, a risk inherent in any form of communication with him.") (quotation marks omitted).

*Carbo*, which involved undercover recordings at the defendant's hotel room, did not discuss scope of consent at all and instead cited *Todisco* to reject, in curt terms, the defendants' argument that the government violated their Fourth Amendment rights because the informant "obtained access to [the defendant's] room under false pretenses." *Carbo*, 314 F.2d at 738; *see also id.* ("[Defendants] request us to re-examine our decision in [*Todisco*] and overrule it. We decline and adhere to our opinion as there expressed."). Like *Todisco*, the court did not consider or analyze whether the informants exceeded the defendant's scope of consent. And *Carbo* did not address the significance of the hotel room at all; that detail was "untethered to the

36

facts of the case and not presented for adjudication." *See* Bryan A. Garner, et. al, THE LAW OF JUDICIAL PRECEDENT 47 (2016).[11]

*Jardines*, in contrast, requires this Court to apply a new inquiry and to examine whether community norms permit someone who has obtained consent to enter a person's living space also to secretly video record while inside—a distinct question untouched by *On Lee* and *Lopez*, and similarly ignored by *Carbo* and *Todisco*. None of these cases bind this Court now because they did not address the legal claim here. Even if they could be read to suggest a different outcome here, that reading would be irreconcilable with *Jones* and *Jardines*. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) ("[W]here intervening Supreme Court authority is clearly irreconcilable with [the Ninth Circuit's] prior circuit authority[,] . . . . a three-judge panel of this court and district courts should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled."); *see also Dixon*, 984 F.3d at 820 (explicitly

---

[11] Not only did *Carbo* not consider the significance of that distinction, the decision was published before the Supreme Court expressly held in *Stoner* that hotel rooms received the same Fourth Amendment protections as the home.

overruling prior caselaw decided under a *Katz* privacy analysis because it was "clearly irreconcilable" with *Jones* and *Jardines*).

**E.   This Court should not follow the Seventh Circuit's unreasoned decision in *Thompson*.**

After *Jardines*, the Seventh Circuit Court of Appeals addressed a similar fact pattern to the one here and concluded that no Fourth Amendment violation occurred, even under a trespass theory.  That decision, however, is not well-reasoned and was wrongly decided.  There, an informant equipped with video- and audio-recording devices entered the defendant's apartment to purchase drugs.  *United States v. Thompson*, 811 F.3d 944, 945–46 (7th Cir. 2016).  The defendant argued that, "despite his consent to the informant's presence in the apartment, the informant had exceeded the 'license' granted to him to be in the apartment, and thus became a trespasser, by secretly videotaping the encounter."  *Id.* at 947.

The Seventh Circuit disagreed but, in doing so, ignored *Jardines*'s scope-of-consent test completely.  The court first noted that "an informant's failure to disclose his true identity does not render consent to his presence invalid."  *Id.* at 948–49.  True.  *See* note 5, above.  But then the court went further and concluded that "when the informant

38

discovers information from where he is lawfully entitled to be, the use of a recording device to accurately capture the events does not vitiate the consent or otherwise constitute an unlawful search." *Id.* at 949. That reasoning skips right over the scope-of-consent inquiry required by *Jardines*.

Under *Jardines*, the court not only had to determine whether the officers were "lawfully entitled" to be where they were (*i.e.*, *Jardines*'s geographical limitation), the court also needed to address whether the officers had a purpose and engaged in conduct that exceeded the scope of their invitation (*i.e.*, *Jardines*'s behavioral and subjective limitations). *See Jardines*, 569 U.S. at 8–9. *Thompson* totally ignored its obligation to apply that test or to look at the necessary factors—*i.e.*, common-law trespass doctrine and prevailing social norms—for the answer.

Instead of adhering to its obligations under *Jardines*, the court reached its conclusion by relying on a passing citation in *Jones* to *On Lee*. *See Thompson*, 811 F.3d at 949 (citing *Jones* and *On Lee*). That reliance was misplaced. In *Jones*, the Court described *On Lee*, in a parenthetical to a "*cf.*" citation, as "no search or seizure where an

informant, who was wearing a concealed microphone, was invited into the defendant's *business*." *Jones*, 565 U.S. at 410 (citing *On Lee*, 343 U.S. at 751–52) (emphasis added).[12]  That citation, which describes permissible undercover conduct in a *business*, does nothing to suggest the permissibility of surreptitious recordings in a *living space*, however, and so has no bearing here.  As discussed above, a living space, unlike the public areas of a business, is an enumerated area entitled to Fourth Amendment trespass protection.  *See* Sections VIII.C.1 & D.1, above.  Further, although social norms do not permit secret recordings in a living space, they might permit secret recordings in the public areas of a

---

[12] In that portion of *Jones*, the Supreme Court was addressing whether two prior cases, which involved the use of "beepers" to track a defendant's movements, foreclosed a conclusion that the installation of a GPS device on a person's car without consent or a warrant violated the Fourth Amendment.  *See Jones*, 565 U.S. at 408–10 (discussing *United States v. Knotts*, 460 U.S. 276 (1983), and *United States v. Karo*, 468 U.S. 705 (1984)).  In reasoning that those cases were not contrary to its holding, the Court thoroughly examined them and then, in a "*cf.*" citation, paraphrased *On Lee*.  *Jones*, 565 U.S. at 410 (citing *On Lee*, 343 U.S. at 751–52).  In context, it is clear that the Court cited *On Lee* not to analyze the scope of consent when a person invites another into their home, but rather to state that the installation of a GPS device on a private vehicle without the owner's consent is different from the placement of a microphone transmitter on an informant's body before the informant enters a business.  *See Jones*, 565 U.S. at 410.

business, where customers freely "[come] and [go]." *See On Lee*, 343 U.S. at 749; *see also* note 9, above.

Any other view would contradict the Supreme Court's reasoning set forth in *Karo*, which *Jones* also discussed at length. In *Karo*, the Court explained that placing an unmonitored tracking device inside a package *before* it was delivered to the defendant did not violate the Fourth Amendment because the person accepting the package accepted all of its contents. *Karo*, 468 U.S. at 711–13. But once the person brought the package into his *residence*, the use of the hidden device to convey the package's location violated the Fourth Amendment. *Id.* at 714–15. This is consistent with *Jardines*'s rule that law enforcement conduct is "sharply circumscribed" once law enforcement enters a constitutionally protected area, regardless of the risks one might assume when engaging in certain kinds of conduct. 569 U.S. at 7.

Nonetheless, the Seventh Circuit latched onto the *Jones* parenthetical describing *On Lee* to announce a rule of law that contradicts the one the Supreme Court later explained at length in *Jardines*. *Jones* did not analyze, discuss, or explain *On Lee*, however— and it did not need to, because the argument Esqueda advances now

41

was not squarely before the Court (in *Jones* or *On Lee*).[13]  Whatever

support *Jones*'s passing reference to *On Lee* may have had at the time

was quickly dispelled by the subsequent express and reasoned analysis

in *Jardines*.  *Jardines* sets forth the scope-of-consent test that must be

applied when an officer enters a constitutionally protected area.  *Id.*

And that inquiry applies regardless of whether the officers were

undercover.  *See Whalen*, 907 F.3d at 1147.

For these reasons, *Thompson* provides no persuasive value here.

Although it gave lip service to *Jardines*, it did not actually apply

*Jardines*'s scope-of-consent test or explain why it could be ignored.  The

court did not analyze whether prevailing social norms would have

permitted the undercover informant's decision to secretly record while

inside the defendant's home, as *Jardines* requires.  The court did not

describe social norms at all.  Instead, the court simply held that the

decision to record did not "vitiate" consent or "otherwise" constitute an

unconstitutional search.  *Thompson*, 811 F.3d at 949.  The court thus

---

[13] The Seventh Circuit also tacked on a citation to *Lopez*, but, as
explained above, that case does not lend support for the proposition that
covert recordings do not exceed the scope of a homeowner's consent.  *See*
Section VIII.D.1, above.

failed to wrestle with the nuanced argument the defendant advanced

pursuant to *Jardines*, and simply rejected, in conclusory fashion, the

defendant's contention that the decision to record exceeded the scope of

consent.

Out-of-circuit authorities should not be followed when they offer

little insight into their reasoning. *See* Garner, THE LAW OF JUDICIAL

PRECEDENT, at 170 ("Persuasiveness [of non-binding precedent] usually

derives from sound reasoning, logical structure, authoritative support,

evidence that the case received careful consideration of the court, and

citation of pertinent authorities."). This Court should therefore apply

the analysis required by *Jardines* rather than follow the Seventh

Circuit's conclusory holding in *Thompson*.

## F. The district court's order suffered from the same flaws as *Thompson*.

In similar fashion, the district court's order failed to follow

*Jardines*. Instead, it relied exclusively on *Lopez* and the Seventh

Circuit's decision in *Thompson*, distinguishing *Jardines* away on invalid

and erroneous grounds.

The district court's reliance on *Thompson* and *Lopez* was

misplaced, for the reasons already described above. *See* Sections

43

VIII.D.1 & E, above. And its reason for relying on those cases over *Jardines* was equally misguided. The district court stated that *Jardines* was distinguishable because the drug-sniffing dogs there allowed law enforcement to perceive smells the officers wouldn't have otherwise been able to perceive. ER-45. But *Jardines* did not reach its conclusion because of the sense-enhancing nature of drug-detection dogs. In fact, the majority declined to reach a conclusion on that basis, even though, as Justice Kagan noted in her concurrence, it could have easily done so under prior precedent. *Jardines*, 569 U.S. at 14 ("If we had decided this case on privacy grounds, we would have realized that *Kyllo* . . . already resolved it.") (Kagan, J., concurring).

Instead, the *Jardines* majority focused on whether the officers entered a constitutionally protected area and exceeded their license while inside, and looked to background social norms and the officers' purpose for the answer. *See* Section VIII.B. The Court did *not*, as the district court suggested, ask whether the dogs allowed the officers "to detect things inside the house that they could not otherwise see

themselves." ER-45. That characterization fundamentally misunderstood *Jardines*, and constituted error.[14]

This Court should conclude that a Fourth Amendment violation occurred here.

## IX. CONCLUSION

For the above reasons, Esqueda respectfully asks this Court to reverse the district court court's denial of his motion to suppress.

> Respectfully submitted,
>
> CUAUHTEMOC ORTEGA
> Federal Public Defender

DATED: February 7, 2023        By  */s/ Waseem Salahi*
                               WASEEM SALAHI
                               Deputy Federal Public Defender
                               Attorney for Defendant-Appellant

---

[14] Further, because the record remains unclear whether the government needed to review the footage to identify Esqueda, the district court had no basis to conclude that the recordings merely provided "the most reliable evidence possible of a conversation in which they were participants and which those officers will be permitted to testify about during any subsequent proceedings." ER-46. In other words, had the officers not unlawfully recorded Esqueda, they may have never been able to identify him in the first place. Critically, Esqueda moved to suppress such an identification as a "fruit" of the unlawful search. ER-39–40.

## CERTIFICATE OF RELATED CASES

Counsel for appellant certifies that he is unaware of any pending

case presenting an issue related to those raised in this brief.

DATED:  February 7, 2023     */s/ Waseem Salahi*
                              WASEEM SALAHI

CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. 32(a)(7)(C) and Circuit Rule 32-1, I certify that this opening brief is proportionally spaced, has a typeface of 14 points or more, and contains approximately 9,171 words.

DATED: February 7, 2023      */s/ Waseem Salahi*
                              WASEEM SALAHI

47