**No. 22-50170**
_____

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

UNITED STATES OF AMERICA

*Plaintiff-Appellee*,

v.

CHRISTOPHER MARCEL ESQUEDA,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Central District of California
No. 8:20-cr-00155-JFW-2
Hon. John F. Walter

**BRIEF OF AMICI CURIAE ACLU CALIFORNIA AFFILIATES**
**IN SUPPORT OF APPELLANT**

Mohammad Tajsar
ACLU Foundation of Southern
California
1313 West 8th Street
Los Angeles, CA 90017
Tel: 213.977.5268
mtajsar@aclusocal.org

Emi Young
ACLU Foundation of Northern
California
39 Drumm Street
San Francisco, CA 94111
Tel: 415.621.2493
eyoung@aclunc.org

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... ii

CORPORATE DISCLOSURE STATEMENT ..................................................... vii

STATEMENT OF INTEREST ................................................................1

SUMMARY OF ARGUMENT ...................................................................3

ARGUMENT ..............................................................................5

I.   By Making it Easier to Record and Analyze Individuals' Activities Inside Private Spaces, Ongoing Advancements in Surveillance Technology Enable Increasingly Invasive Law Enforcement Searches. ........................................5

II.   Law Enforcement Has Historically Targeted Minority Religious and Political Communities in Private Spaces for Suspicionless Surveillance. .....11

III.   Law Enforcement Use of Technology for Suspicionless Surveillance in Private Spaces Can Chill the Exercise of First Amendment Freedoms. .......16

IV.   The Court Must Interpret Fourth Amendment Doctrine to Require a Warrant for Searches Involving Surreptitious Video Recording to Protect Against First Amendment Injuries. ............................................................26

     A.   The Fourth Amendment Warrant Requirement Must be Applied with "Scrupulous Exactitude" In Order to Protect Individual Liberties and Ensure Government Searches Do Not Exceed the Scope of Their Justifications. ........................................................28

     B.   Courts Must Adapt Fourth Amendment Doctrine to Developments in Surveillance and Data Analysis Technology. .......................................31

     C.   The Constitution Requires a Warrant Where Surreptitious Video Recording in Private Spaces Threatens First Amendment Freedoms. ..33

CONCLUSION ...........................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brandenburg v. Ohio*,
  395 U.S. 444 (1969)...........................................................................1

*Citizens United v. FEC*,
  130 S. Ct. 876 (2010).......................................................................18

*Dombrowski v. Pfister*,
  380 U.S. 479 (1965).........................................................................17

*Fazaga v. FBI*,
  965 F.3d 1015 (9th Cir. 2020) .....................................................1, 14

*Florida v. Jardines*,
  569 U.S. 1 (2013).............................................................................33

*Hassan v. City of New York*,
  804 F.3d 277 (3d Cir. 2015) ...........................................................23

*Kyllo v. United States*,
  533 U.S. 27 (2001)................................................................27, 29, 32

*Mahanoy Area Sch. Dist. v. B.L.*,
  141 S. Ct. 2038 (2021).......................................................................1

*Martin v. City of Struthers*,
  319 U.S. 141 (1943).........................................................................17

*NAACP v. Alabama re. Patterson*,
  357 U.S. 449 (1958)....................................................................17, 19

*Roaden v. Ky*,
  413 U.S. 496 (1973).........................................................................29

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984).........................................................................17

*Stanford v. Texas*,
379 U.S. 476 (1965) ...................................................................... 30

*United States v. Hansen*,
25 F.4th 1103 (9th Cir. 2022) ........................................................ 1

*United States v. Jones*,
565 U.S. 400 (2012) .................................................... 8, 26, 27, 33

*United States v. Koyomejian*,
970 F.2d 536 (9th Cir. 1992) (en banc) ..................................... 5, 30

*United States v. U.S. Dist. Court (Keith)*,
407 U.S. 297 (1972) ...................................................................... 32

*Zurcher v. Sandford Daily*,
436 U.S. 547 (1978) ................................................................. 4, 29

## Other Authorities

Aaron Holmes, *A secretive spyware company is selling cameras and
listening devices disguised as tombstones and car seats to police
and federal agencies like the FBI and ICE. Here's some of the
most outrageous surveillance tech it offers,* INSIDER (Jan. 10,
2020) ............................................................................................... 6

Alice Speri, *The FBI Has a Long History of Treating Political Dissent
as Terrorism,* THE INTERCEPT (Oct. 22, 2019) ........................... 13

*All You Need to Know About SD, HD, and 4K Resolutions,*
FOOTAGESECRETS (Jan. 2, 2021) .................................................. 7

Andrew Guthrie Ferguson, *Facial Recognition and the Fourth
Amendment*, 105 MINN. L. REV. 1105 (2021) ............................... 9

Ángel Díaz, *New York City Police Department Surveillance
Technology*, BRENNAN CENTER FOR JUSTICE (Oct. 4, 2019), ................. 16

Clare Garvie et al., *The Perpetual Line-Up: Unregulated Police Face
Recognition in America,* GEORGETOWN LAW CENTER ON
PRIVACY & TECHNOLOGY 9 (Oct. 18, 2016) ............................. 8, 9

Daniel J. Solove, *The First Amendment as Criminal Procedure*, 82
N.Y.U. L. REV. 112, 142–50 (2007).................................................................18

Eli Watkins, *Watchdog says FBI has access to more than 641 million
'face photos,'* CNN (June 4, 2019) .....................................................11

Fredrick Schauer, *Fear, Risk and the First Amendment: Unraveling
the 'Chilling Effect,'* 58 B.U. L. REV. 685, 693 (1978) ...................................18

George Joseph & Kenneth Lipp, *IBM Used NYPD Surveillance
Footage to Develop Technology That Allows Police to Search by
Skin Color,* THE INTERCEPT (Sept. 6, 2018) ..................................................10

*How Often Do the FBI and Department of Justice Seek Search
Warrants and Subpoenas?*, SYRACUSE UNVIERSITY:
TRANSACTIONAL RECORDS ACCESS CLEARINGHOUSE
(Aug. 22, 2022) ..............................................................................................34

Jennifer Lynch*, Face Off: Law Enforcement Use of Facial
Recognition Technology,* ELECTRONIC FRONTIER
FOUNDATION 9 (Feb. 12, 2018) ....................................................................24

Jerry Markon, *Tension grows between Calif. Muslims, FBI after
informant infiltrates mosque,* WASH. POST (Dec. 5, 2010)...........................15

Julie E. Cohen, *Examined Lives: Informational Privacy and the
Subject as Object*, 52 STAN. L. REV. 1373, 1426 (2000)...............................25

Kashmir Hill, *The Secretive Company That Might End Privacy as We
Know It*, NEW YORK TIMES (Nov. 2, 2021) ...................................................11

Katelyn Ringrose, *Law Enforcement's Pairing of Facial Recognition
Technology with Body-Worn Cameras Escalates Privacy
Concerns,* 105 V.A. L. REV. 57 (2019). ..........................................................26

Kelsey Piper, *You know the "enhance" function TV cops use on
pictures? It's real now*, VOX (Sep. 4, 2019)......................................................7

Khaled A. Beydoun, *Acting Muslim*, 53 HARV. C.R.-C.L. L. REV. 1,
29 (2018) ..........................................................................................................14

Leila Rafei, *How the FBI Spied on Orange County Muslims and Attempted to Get Away With It,* AM. CIV. LIBERTIES UNION (Nov. 8, 2021) ................................................................... 15

Margot E. Kaminski & Shane Witnov, *The Conforming Effect: First Amendment Implications of Surveillance, Beyond Chilling Speech*, 49 U. RICH. L. REV. 465, 499 (2015) ................................ 19

Matthew A. Wasserman, *First Amendment Limitations on Police Surveillance: The Case of the Muslim Surveillance Program*, 90 N.Y.U. L. REV. 1786 (2015) ............................................... 22

Muslim Amer. Civil Libs. Coal., et al., *Mapping Muslims: NYPD Spying and its Impact on American Muslims* 15 (2013), .................................. 20

Neil M. Richards, *The Dangers of Surveillance*, 126 HARV. L. REV. 1934, 1948 (2013) .................................................. 19

Nicole Turner Lee and Caitlin Chin, *Police surveillance and facial recognition: Why data privacy is imperative for communities of color*, BROOKINGS (April 12, 2022) .............................. 31

OFF. OF THE INSPECTOR GEN., U.S. DEP'T OF JUSTICE, *Review of FBI's Investigations of Certain Domestic Advocacy Groups* 1 (Sept. 2010) .......................................................... 14

Peter Bibring, *You Have the Right to Remain Spied On*, AM. CIV. LIBERTIES UNION (Aug. 16, 2012) ................................ 15

*Robot Surveillance: AI, Video Analytics, and Privacy*, AM. CIV. LIBERTIES UNION 7-8 (June 2019) .......................... 9, 10

Ryan Mac & Kashmir Hill, *Clearview AI settles suit and agrees to limit sales of facial recognition database*, NEW YORK TIMES (May 9, 2022) ....................................................... 11

S. REP. NO. 94–755, pt. 2 (1976) ..................................... 13, 14

Sanya Mansoor, *'Who Else is Spying on Me?' Muslim Americans Bring the Fight Against Surveillance to the Supreme Court,* TIME (Sept. 16, 2021) ................................................. 21

Shirin Sinnar, *Questioning Law Enforcement: The First Amendment and Counterterrorism Interviews*, 77 BROOK. L. REV. 41 (2011) ..................22

Karen Gullo, *Surveillance Chills Speech—As New Studies Show—And Free Association Suffers,* ELECTRONIC FRONTIER FOUNDATION (May 19, 2016) ..................................................................24, 25

Sylvester A. Johnson & Steven Weitzman, "*True Faith and Allegiance" – Religion and the FBI*, in THE FBI AND RELIGION: FAITH AND NATIONAL SECURITY BEFORE AND AFTER 9/11 1, 2 (Sylvester A. Johnson & Steven Weitzman eds., 2017) .........................................................................12

Teresa Watanabe & Paloma Esquivel, *L.A. area Muslims say FBI surveillance has a chilling effect on their free speech and religious practice,* L.A. TIMES (Mar. 1, 2009)...................................................22

Theodore Claypoole, *A Clear Solution to Police Surveillance Creep: Warrants Needed for Biometric Analysis,* A.B.A. BUS. LAW TODAY (Aug. 3, 2020) .......................................................................34

Todd Feathers, *This Company is Selling Bizarre and Expensive Spy Equipment to Police,* VICE (July 16, 2020) ........................................6

Will Knight, *Clearview AI Has New Tools to Identify you in Photos,* WIRED (Oct. 4, 2021) .........................................................................11

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rules of Appellate Procedure 26.1(a) and 29(a)(4)(A), *amici curiae* state they do not have a parent corporation and no publicly held corporation owns 10% or more of their stock.

# STATEMENT OF INTEREST[1]

Amici curiae the American Civil Liberties Union of Southern California and the American Civil Liberties Union of Northern California (together the ACLU California Affiliates) are affiliates of the national American Civil Liberties Union (ACLU), a nonprofit, nonpartisan organization dedicated to defending the principles embodied in the United States Constitution and our nation's civil rights laws. Since their founding, the ACLU California Affiliates and the ACLU have vigorously defended First and Fourth Amendment rights against unlawful government intrusions and surveillance, frequently serving as either direct counsel or amicus curiae in key cases before the United States Supreme Court, this Court, and other federal courts. *See, e.g.*, *Brandenburg v. Ohio*, 395 U.S. 444 (1969); *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038 (2021); *Fazaga v. FBI*, 965 F.3d 1015 (9th Cir. 2020), *rev'd and remanded*, 142 S. Ct. 1051 (2022); *United States v. Hansen*, 25 F.4th 1103 (9th Cir. 2022). ACLU attorneys and advocates bring

---

[1] Pursuant to Rule 29(a)(2), counsel for amici curiae certify that amici curiae sought consent from all parties to the filing of this brief. Counsel for Appellant Christopher Marcel Esqueda and counsel for the Appellee the United States have consented to the filing of this brief. Pursuant to Rule 29(a)(4)(e), counsel for amici curiae state that no counsel for a party authored this brief in whole or in part, and no person other than amici curiae, their members, or their counsel made a monetary contribution to its preparation or submission.

litigation to protect these constitutional principles and promote legislation and

local policy in accordance with these values.

## SUMMARY OF ARGUMENT

We live in an age of pervasive surveillance. Some we knowingly invite, like our engagement with immensely powerful computers we store in our pockets and purses, or the cameras we place outside of our front doors. Some of that surveillance we recognize only in passing, like the digital crumbs we suspect our applications and accounts leave online for others to collect, or the network of cameras and microphones that increasingly adorn public streetcorners. And there is yet even more surveillance that we may not be aware of at all, like button-sized audio and video recording devices that can easily line an officer's shirt, or the sophisticated facial recognition algorithms that can cross-reference a secretly snapped image against a database of billions of faces scraped from the internet. Whatever form it takes, and whatever we may know about it, the breadth and ease of the data collection that contemporary surveillance technology enables has reshaped society's relationship with those who wield this surveillance power.

And yet, notwithstanding advancements in the power and precision of surveillance tools, the same core rules governing the state's use of these technologies against individuals remain: their use must be limited, reasonable, and must be sensitive to the liberties that form the Constitution's core guarantees of individual rights—including free exercise, association, and expression. Consistent with these principles, the Supreme Court has held that in the context of

government search power, "the requirements of the Fourth Amendment must be applied with scrupulous exactitude" when First Amendment rights are at stake. *Zurcher v. Sandford Daily*, 436 U.S. 547, 564 (1978) (internal citation and quotation marks omitted).

In this case, the district court below denied Mr. Esqueda's motion to suppress, permitting the use of video and audio recordings obtained covertly by undercover law enforcement officers and informants without a warrant. This decision ignores the danger of unchecked surveillance authority in places where personal privacy is most threatened by the increasingly invasive powers of surveillance technology: inside exclusive residences and places of private congregation, where our most cherished First Amendment freedoms are often expressed. Although the officers' surreptitious recordings of Mr. Esqueda's room did not reveal activities protected by the First Amendment, the district court's decision opens the door to investigative excesses that threaten the delicate balance the Fourth Amendment regulates between the government's investigative powers and individuals' right to freedom from invasive police scrutiny.

To faithfully apply the "scrupulous exactitude" standard, this Court should recognize that the common law trespass theory of the Fourth Amendment requires a warrant in circumstances where an individual is not aware of, and does not consent to, the surreptitious recording of private spaces, especially those spaces

where First Amendment freedoms are traditionally exercised. Ongoing advancements in surveillance technology—which permit the government to observe and retain far more information than would be possible with the naked eye—pose a far greater threat to the privacy and sanctity of a home or congregation than a person's physical entry into the space. And considering the historical and contemporary practices of targeting minority political and religious communities for surveillance, affording the government unchecked covert surveillance authority has the potential to cause significant chilling effects on the exercise of First Amendment-protected religious and political association and expression. Where, as here, First and Fourth Amendment interests converge, this Court must take special care to ensure the government's search authority is strictly construed as technology amplifies the scope of its search capabilities.

## ARGUMENT

I. **By Making it Easier to Record and Analyze Individuals' Activities Inside Private Spaces, Ongoing Advancements in Surveillance Technology Enable Increasingly Invasive Law Enforcement Searches.**

It has long been understood that "video surveillance can result in extraordinarily serious intrusions into personal privacy." *United States v. Koyomejian*, 970 F.2d 536, 551 (9th Cir. 1992) (en banc) (Kozinski, J., concurring). But recent developments in recording technology have only increased

these intrusions, making it is easier for law enforcement to amplify the scope of searches and invade the privacies of life in new and unprecedented ways.

Since James Bond and his plethora of spy gadgets first captured the minds of moviegoers in the 1960s, police use of covert recording technology has become a familiar conceit of modern cultural life. Although government agents have deployed crude Bond-style devices ever since, contemporary advances in the technical capacity of recording devices, the increasingly negligible cost of digital data storage, and the greater processing power available to analyze these troves of data have resulted in widespread adoption of surveillance technology. For example, a company called Advanced Covert Technology, which makes surveillance devices for law enforcement, released a 2020 catalogue of innovative video and audio recording tools, including high power cameras and/or microphones concealed in energy drinks, tobacco containers, vape pens, sports caps, car keys, t-shirts, and other items.[2] Similarly, a company called Special Services Group sells complex surveillance technology hidden in objects like rocks, trees, tombstones, car seats, vacuum cleaners, and even someone's mouth.[3] The

---

[2] Todd Feathers, *This Company is Selling Bizarre and Expensive Spy Equipment to Police*, VICE (July 16, 2020, 9:00 AM), https://www.vice.com/en/article/pkyz47/this-company-is-selling-bizarre-and-expensive-spy-equipment-to-police.

[3] Aaron Holmes, *A secretive spyware company is selling cameras and listening devices disguised as tombstones and car seats to police and federal agencies like the FBI and ICE. Here's some of the most outrageous surveillance tech it offers*,

company also advertises a device called "Wand II," which allows users to listen to conversations through walls.[4] According to public procurement data, SSG enjoys dozens of federal contracts with agencies including the FBI, DEA, Secret Service, and ICE worth over $2.5 million.[5]

In addition to the proliferation of covert technology that permits invasive surveillance without detection, audio and video recording quality has increased exponentially in the past decade. High-definition technology has been surpassed by 4K cameras that record video with four times higher resolution, capturing smaller and more specific details than ever before.[6] These cameras can be augmented with powerful lenses or complex software-powered digital zoom capabilities to enhance low-light recordings. Law enforcement can then utilize image enhancing technology to examine minute details indiscernible to humans or older technology.[7]

---

INSIDER (Jan. 10, 2020, 12:41 PM), https://www.businessinsider.com/special-services-group-police-hidden-cameras-rocks-tombstones-2020-1.

[4] *Id.*

[5] *Id.*

[6] *All You Need to Know About SD, HD, and 4K Resolutions*, FOOTAGESECRETS (Jan. 2, 2021), https://www.footagesecrets.com/technical-faq/sd-hd-4k-explained/.

[7] Kelsey Piper, *You know the "enhance" function TV cops use on pictures? It's real now.*, VOX (Sep. 4, 2019, 10:30 AM), https://www.vox.com/future-perfect/2019/9/4/20848008/ai-machine-learning-enhance-button.

These increasingly covert and detailed recordings can capture more of someone's private space than ever before. A recording of someone inside their home, for instance, could easily provide law enforcement with a record of details they could not capture or analyze with the naked eye, such as the titles of books on the bookshelves, the precise content of photos on the walls, or descriptions of the images and files open on their computer. These capabilities have advanced faster than society's expectations about officers' capabilities during a search. *See United States v. Jones*, 565 U.S. 400, 430 (2012) (Alito, J., concurring) (society expects "that law enforcement agents and others would not—and indeed, in the main, simply could not secretly monitor and catalogue every single movement" of an individual).

The increasing capacity of surveillance tools is not the only technological development with grave consequences for privacy interests; equally significant are technologies which enable advanced analysis and deployment of such tools. Consider the twin examples of face recognition and artificial intelligence-powered video analytics technology. Face recognition technology (FRT) is an automated process that identifies individuals by comparing images of their faces to a known set of faces in a digital database.[8] FRT algorithms "extract[] features from the face

---

[8] Clare Garvie et al., *The Perpetual Line-Up: Unregulated Police Face Recognition in America*, GEORGETOWN LAW CENTER ON PRIVACY & TECHNOLOGY 9 (Oct. 18, 2016),

… that can be numerically quantified, like eye position or skin texture" to probabilistically match against images in the database.[9] Contemporary FRT also allows law enforcement to search stored video footage and monitor identities in real-time.[10]

Similarly, video analytics technology (VAT) uses artificial intelligence to enhance, augment, and analyze footage for information on recorded individuals. Rather than relying on humans to analyze feeds, VAT utilizes "deep learning [that] has revolutionized the ability to process oceans of data, providing a 'short cut' around attempts to analyze digitized content manually."[11] VAT has a wide range of powerful abilities, including contextual understanding—which recognizes visual cues like tattoos, text, gestures, objects, clothing, and how people walk to form an assessment of the scene and context captured.[12] Government clients like the NYPD

---

https://www.perpetuallineup.org/sites/default/files/2016-12/The%20Perpetual%20Line-Up%20-%20Center%20on%20Privacy%20and%20Technology%20at%20Georgetown%20Law%20-%20121616.pdf.

[9] *Id.*

[10] Andrew Guthrie Ferguson, *Facial Recognition and the Fourth Amendment*, 105 MINN. L. REV. 1105, 1116-19 (2021).

[11] Jay Stanley, *The Dawn of Robot Surveillance: AI, Video Analytics, and Privacy*, AM. CIV. LIBERTIES UNION 7-8 (June 2019), https://www.aclu.org/sites/default/files/field_document/061119-robot_surveillance.pdf.

[12] *Id.* at 17–21.

and ICE dominate the VAT industry, holding a 27-percent share as of 2016.[13] As more agencies apply VAT to data from existing technologies like body cameras, police can increasingly access "things that officers might not perceive, [which] will represent a significant shift in the technology from a police accountability to a community surveillance tool."[14] While no "government agency will hire the armies of expensive and distractable human that would be required to monitor all the video now being collected, AI agents–which are cheap and scalable–will be available to perform the same tasks."[15] Furthermore, VAT allows law enforcement to search surveillance footage by skin tone to specifically target racial minority communities, as seen in the NYPD's post-9/11 practices.[16]

State and federal police agencies can pair powerful FRT and VAT technologies with data procurement and social media monitoring technology to collect extensive information on the individuals and objects captured. Companies like Clearview AI scrape images from social media and websites to automatically match with images uploaded by their approximately 3,100 law enforcement

---

[13] *Id.* at 9–10.

[14] *Id.* at 15.

[15] *Id.* at 4.

[16] George Joseph & Kenneth Lipp, *IBM Used NYPD Surveillance Footage to Develop Technology That Allows Police to Search by Skin Color*, THE INTERCEPT (Sept. 6, 2018, 7:00 AM), https://theintercept.com/2018/09/06/nypd-surveillance-camera-skin-tone-search/.

clients.[17] Their database contains over 20 billion photos,[18] far exceeding the approximately 640 million in the FBI database.[19] Other companies provide similar tools, with some even allowing agencies to target specific demographic subsets. ODIN Intelligence, for instance, provides a database of personal information on individuals experiencing homelessness, including age, criminal record, housing history, and known associates as well as FRT services.[20]

## II. Law Enforcement Has Historically Targeted Minority Religious and Political Communities in Private Spaces for Suspicionless Surveillance.

While law enforcement's technological capabilities increase, history and recent practice suggest that these technologies will be utilized against minority

---

[17] Will Knight, *Clearview AI Has New Tools to Identify you in Photos*, WIRED (Oct. 4, 2021, 7:00 AM), https://www.wired.com/story/clearview-ai-new-tools-identify-you-photos/#:~:text=Clearview%20has%20collected%20billions%20of,tying%20them%20to%20online%20profiles; Kashmir Hill, *The Secretive Company That Might End Privacy as We Know It*, NEW YORK TIMES (Nov. 2, 2021), https://www.nytimes.com/2020/01/18/technology/clearview-privacy-facial-recognition.html.

[18] Ryan Mac & Kashmir Hill, *Clearview AI settles suit and agrees to limit sales of facial recognition database*, NEW YORK TIMES (May 9, 2022), https://www.nytimes.com/2022/05/09/technology/clearview-ai-suit.html.

[19] Eli Watkins, *Watchdog says FBI has access to more than 641 million 'face photos,'* CNN (June 4, 2019, 4:01 PM), https://www.cnn.com/2019/06/04/politics/gao-fbi-face-photos/index.html.

[20] Joseph Cox, *Tech Firm Offers Cops Facial Recognition to ID Homeless People*, VICE (Feb. 8, 2022, 11:19 AM), https://www.vice.com/en/article/wxdp7x/tech-firm-facial-recognition-homeless-people-odin.

religious and political communities. Law enforcement agencies have a fraught history of invading private spaces of minority communities on a suspicionless basis. Throughout the 20th century, the FBI targeted minority religious communities like the Church of God in Christ during World War I, Jews during the Cold War, Catholic priests during the Vietnam War, and the Moorish Science Temple of America between the 1920s and 1960s ostensibly "in an effort to unearth internal enemies." [21] By the 1930s, the agency "began recruiting operatives to infiltrate" the private spaces of different groups "by posing as prospective converts … [a] strategy [that] proved a harbinger of the bureau's relationship" with religious organizations throughout the coming decades.[22]

Similarly, law enforcement agencies have consistently invaded political minorities' private spaces without suspicion. The Palmer Raids, launched in 1919 by the FBI's precursor agency, were a series of invasions into communities holding minority political views. "[P]olice officers carrying clubs and blackjacks but no arrest warrants stormed apartments and meeting rooms, and rounded up scores of

---

[21] Sylvester A. Johnson & Steven Weitzman, *"True Faith and Allegiance" – Religion and the FBI*, *in* THE FBI AND RELIGION: FAITH AND NATIONAL SECURITY BEFORE AND AFTER 9/11 1, 2 (Sylvester A. Johnson & Steven Weitzman eds., 2017).

[22] *Id.*

… immigrants they accused of being 'leftists' and 'subversives.'"[23] This kind of suspicionless surveillance of private spaces continued through the 20th century.[24] A Senate report criticizing certain intelligence practices said the federal government targeted citizens in dragnet surveillance operations "on the basis of their political beliefs, even when those beliefs posed no threat of violence or illegal acts."[25]

Today, advances in the capabilities of surveillance technologies allow agencies to engage in this kind of suspicionless targeting in far more insidious ways. Since 2010, "the FBI has surveilled black activists and Muslim Americans, Palestinian solidarity and peace activists, Abolish ICE protesters, Occupy Wall Street, environmentalists, Cuba and Iran normalization proponents, and protests at the Republican National Convention."[26] This surveillance often takes place inside private spaces, happens without suspicion or a warrant, and utilizes modern recording technology. During the Bush administration, the Department of Homeland Security launched a program that relied on "federal electronic

---

[23] Alice Speri, *The FBI Has a Long History of Treating Political Dissent as Terrorism*, THE INTERCEPT (Oct. 22, 2019, 12:03 PM), https://theintercept.com/2019/10/22/terrorism-fbi-political-dissent/.

[24] *Id.*

[25] S. REP. NO. 94–755, pt. 2, at 5 (1976).

[26] Speri, *supra* note 23.

surveillance" technology as its "backbone" to monitor the private communications of Muslims without a court order.[27] During the Obama administration, DHS used both technology and manpower to target Muslim-American communities by "strategically map[ping] and then tap[ping] informants within mosques, student organizations … and other places for religious and political discussion and gathering" without a warrant.[28] As the FBI's own Office of the Inspector General found when investigating certain FBI surveillance operations of minority political advocacy groups in the early 2000s, dragnet investigations of this sort often lacked adequate factual predicates and were supported only by "speculative, after-the-fact rationalizations."[29]

In a particularly well-known example, FBI agents extensively surveilled the Muslim community in Orange County, California between 2006 and 2007, utilizing an undercover informant to surreptitiously record inside congregants' homes and places of worship. *See Fazaga v. FBI*, 965 F.3d 1015, 1026–28 (9th Cir. 2020), rev'd and remanded, 142 S. Ct. 1051 (2022). The FBI and informant planted video and audio recording devices in everyday objects, gathering hundreds

---

[27] Khaled A. Beydoun, *Acting Muslim*, 53 HARV. C.R.-C.L. L. REV. 1, 29 (2018).
[28] *Id.* at 35.
[29] OFF. OF THE INSPECTOR GEN., U.S. DEP'T OF JUSTICE, *Review of FBI's Investigations of Certain Domestic Advocacy Groups* 1, 186-87 (Sept. 2010), https://www.oversight.gov/sites/default/files/oig-reports/s1009r.pdf.

14

of hours of recordings of people and conversations inside mosques, homes, businesses, and Muslim associations.[30] They also concealed covert recording devices on the informant in discrete items like a key fob and shirt button.[31] According to his own sworn statements, the informant's handlers instructed him to use technology to blanket record conversations, capture the internal layout of mosques, homes, and businesses, and gather specific information on community members.[32] Regardless of the lack of any credible suspicion, his FBI handlers instructed him to "randomly surveil and spy on" the whole Southern California Muslim community "to ferret out potential terrorists" because "Islam is a threat to our national security."[33] Although this dragnet operation lasted for 18 months, it did not result in a single counterterrorism conviction.[34]

---

[30] Leila Rafei, *How the FBI Spied on Orange County Muslims and Attempted to Get Away With It*, AM. CIV. LIBERTIES UNION (Nov. 8, 2021), https://www.aclu.org/news/national-security/how-the-fbi-spied-on-orange-county-muslims-and-attempted-to-get-away-with-it.

[31] Paul Harris, *The ex-FBI informant with a change of heart: 'There is no real hunt. It's fixed,'* THE GUARDIAN (Mar. 20, 2012, 11:50 AM), https://www.theguardian.com/world/2012/mar/20/fbi-informant.

[32] Rafei, *supra* note 30.

[33] Jerry Markon, *Tension grows between Calif. Muslims, FBI after informant infiltrates mosque*, WASH. POST (Dec. 5, 2010).

[34] Peter Bibring, *You Have the Right to Remain Spied On*, AM. CIV. LIBERTIES UNION (Aug. 16, 2012), https://www.aclu.org/news/national-security/you-have-right-remain-spied.

These types of suspicionless federal surveillance operations, as well as similar local law enforcement ones,[35] routinely utilize modern recording devices to surveil minority communities in private spaces without a warrant. Advances in this surveillance technology only exacerbate the dangers associated with these practices. These developments have "the potential to worsen existing disparities in treatment suffered by people of color and the poor by embedding, amplifying, and hiding biases," and carry "the possibility of widespread chilling effects as we all become highly aware that our actions are being not just recorded and stored, but scrutinized and evaluated on a second-by-second basis."[36]

## III.    Law Enforcement Use of Technology for Suspicionless Surveillance in Private Spaces Can Chill the Exercise of First Amendment Freedoms.

The combination of rapidly developing surveillance technology and historical practices of discriminatory law enforcement surveillance has destructive implications for First Amendment rights. The First Amendment's safeguards against intrusions into associational and expressive freedom are rooted in the Constitutional ideals of free and unfettered speech, thought, belief, and practice. "[C]hoices to enter into and maintain certain intimate human relationships must be

---

[35] *See, e.g.,* Ángel Díaz, *New York City Police Department Surveillance Technology*, BRENNAN CENTER FOR JUSTICE (Oct. 4, 2019), https://www.brennancenter.org/our-work/research-reports/new-york-city-police-department-surveillance-technology.

[36] Stanley, *supra* note 11, at 4–5.

secured against undue intrusion by the State because … such relationships … safeguard[] the individual freedom that is central to our constitutional scheme … [and] a fundamental element of personal liberty." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984).

The First Amendment was designed to protect minority views and practices. "The authors of the First Amendment knew that novel and unconventional ideas might disturb the complacent, but they chose to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance." *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943). Furthermore, "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *NAACP v. Alabama ex re. Patterson*, 357 U.S. 449, 460 (1958).

First established during the Cold War in response to government targeting of suspected Communists, the chilling-effects doctrine protects people from the direct and indirect effects government action can have on First Amendment rights. *See Dombrowski v. Pfister*, 380 U.S. 479, 487–89 (1965). In Schauer's classic definition, "[a] chilling effect occurs when individuals seeking to engage in an activity protected by the [F]irst [A]mendment are deterred from so doing by

governmental [practices] not specifically directed at that protected activity."[37] Courts have found chilling effects in a wide range of contexts, including surveillance of political activists, identification of anonymous speakers, prevention of unfettered consumption of ideas, discovery of ties to political groups, and more.[38] Protecting First Amendment freedoms from such effects is a preferred value, meaning that when it conflicts with other values, it must receive more weight. *See*, *e.g.*, *Citizens United v. FEC*, 130 S. Ct. 876, 891 (2010) ("First Amendment standards, however, must give the benefit of the any doubt to protecting rather than stifling speech." (internal citation and quotation marks omitted)).

The chilling-effects doctrine finds special utility in cases challenging unlawful government surveillance. When state agents surveil individuals inside private spaces like homes or places of worship, those targeted are likely to respond by self-censoring and limiting outward expression of protected association, speech, and religious practice. Government surveillance "may induce members [of a group] to withdraw from the [a]ssociation and dissuade others from joining because of fear of exposure of their beliefs shown through their association and of

---

[37] Fredrick Schauer, *Fear, Risk and the First Amendment: Unraveling the 'Chilling Effect,'* 58 B.U. L. REV. 685, 693 (1978).

[38] *See* Daniel J. Solove, *The First Amendment as Criminal Procedure*, 82 N.Y.U. L. REV. 112, 142–50 (2007).

the consequences." *NAACP v. Alabama ex re. Patterson*, 357 U.S. 449, 463 (1958). "When we are watched while engaging in intellectual activities, broadly defined—thinking, reading, web-surfing, or private communication—we are deterred from engaging in thoughts or deeds that others might find deviant."[39] Thus surveillance "menaces our society's foundational commitments to intellectual diversity and eccentric individuality."[40] Even the mere *suggestion* of surveillance dissuades people from engaging in protected First Amendment activities.[41] All told, "the existing evidence is strong enough to conclude that widespread surveillance, or even the belief in it, is damaging to the development of diverse viewpoints."[42]

Recent history shows that the harm surveillance activities cause to expressions of First Amendment rights is particularly strongly felt among minority religious and political communities. An NYU-sponsored research study extensively documented the chilling effects post-9/11 NYPD surveillance had on targeted Muslim communities. Almost all fifty-seven interviewees—American

---

[39] Neil M. Richards, *The Dangers of Surveillance*, 126 HARV. L. REV. 1934, 1948 (2013).

[40] *Id.*

[41] Margot E. Kaminski & Shane Witnov, *The Conforming Effect: First Amendment Implications of Surveillance, Beyond Chilling Speech*, 49 U. RICH. L. REV. 465, 499 (2015).

[42] *Id.*

Muslims residing in New York—explained that, in their experience, "appearing Muslim, or appearing to be a certain type of Muslim, invites unwanted attention or surveillance from law enforcement."[43] This fear of scrutiny "led some interviewees or their friends to change their appearance and practice of religion."[44] Additional reported effects included decreased mosque attendance, teachers self-editing curricula, individuals censoring their own speech, and widespread suspicion of both community members and newcomers.[45] "The ever-present surveillance chills—or completely silences—speech whether they are engaging in political debate, commenting on current events, encouraging community mobilization, or joking around with friends."[46]

The dragnet FBI surveillance operation in Orange County had similar impacts. After finding out about the surveillance, Sheikh Yassir Fazaga, a therapist and imam at a mosque infiltrated by the FBI's informant, said he felt immense

---

[43] Muslim Amer. Civil Libs. Coal., et al., *Mapping Muslims: NYPD Spying and its Impact on American Muslims* 15 (2013), https://www.law.cuny.edu/wp-content/uploads/page-assets/academics/clinics/immigration/clear/Mapping-Muslims.pdf.

[44] *Id.* at 17.

[45] *Id*. at 17–18.

[46] *Id.* at 20.

"panic" and "vulnerability."[47] He "remembers opening up the electrical sockets in his office and searching behind his computer monitor, looking for recording devices."[48] Fazaga also observed an sharp break in trust and cohesion within his community, with congregants feeling targeted because of their faith. For him and his congregants, it was "not the fear of what they might find out, … [it was] the fact that you're violated—and you're violated in the place where you are supposed to feel the safest."[49] The constant fear of surveillance caused "distrust," distress, and anxiety among the community that was "exhausting."[50] "[M]any pulled back from group activities[,] became more reserved in their interactions at the mosques," or stopped attending altogether.[51] Even today, Fazaga, now an imam in Tennessee, "says he always talks on the phone as if he is being listened to" as the distrust he developed "is not something he can leave behind."[52]

This chilling effect on First Amendment freedoms was not limited to the targeted mosques. In fact, as news of the FBI's surveillance activities in Orange

---

[47] Sanya Mansoor, *'Who Else is Spying on Me?' Muslim Americans Bring the Fight Against Surveillance to the Supreme Court*, TIME (Sept. 16, 2021, 1:13 PM), https://time.com/6097712/muslim-american-surveillance-supreme-court-sept-11/.

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] *Id.*

County spread, Muslims across the country changed how they "conducted themselves in public."[53] Parents "said they felt uneasy about their children being politically active or even joining Muslim Student Associations on … campuses" and "many imams were warned against discussing social justice issues in their sermons by their boards of directors."[54] Across California, many Muslims said "a climate of suspicion toward them, fueled by 9/11 and underscored by the latest disclosures of FBI surveillance, is inhibiting their freedoms of speech and faith."[55] Because many post-9/11 law enforcement surveillance operations targeted Muslim communities merely for being Muslim rather than for any particularized suspicion, a widespread climate of fear permeated these communities.[56]

Although law enforcement targeting of Muslim Americans post-9/11 is well established, they are not the only minority community that has experienced the chilling effects of extensive surveillance in modern times. This Court held in

---

[53] *Id.*

[54] *Id.*

[55] Teresa Watanabe & Paloma Esquivel, *L.A. area Muslims say FBI surveillance has a chilling effect on their free speech and religious practice*, L.A. TIMES (Mar. 1, 2009), https://www.latimes.com/archives/la-xpm-2009-mar-01-me-muslim1-story.html.

[56] *See e.g.,* Shirin Sinnar, *Questioning Law Enforcement: The First Amendment and Counterterrorism Interviews*, 77 BROOK. L. REV. 41 (2011); Matthew A. Wasserman, *First Amendment Limitations on Police Surveillance: The Case of the Muslim Surveillance Program*, 90 N.Y.U. L. REV. 1786 (2015).

*Presbyterian Church (U.S.A.) v. United States* that INS surveillance of church activities "chilled *individual congregants* from attending worship services," which "in turn interfered with the churches' ability to carry out their ministries." 870 F.2d 518, 522 (9th Cir. 1989) (emphasis in original). Similarly, in a case about NYPD surveillance of New York Muslims, the Third Circuit explained, "What occurs here in one guise is not new. We have been down similar roads before. Jewish-Americans during the Red Scare, African-Americans during the Civil Rights Movement, and Japanese Americans during World War II are examples that readily spring to mind." *Hassan v. City of New York*, 804 F.3d 277, 309 (3d Cir. 2015).

Just as in religious communities, law enforcement surveillance—or the threat of such surveillance—can have devastating impacts on the ability of minority political communities to effectively exercise their First Amendment freedoms. Furthering their long history of targeted surveillance of political minorities, law enforcement officers today consistently target participants in Black Lives Matter and other Black-led political movements for suspicionless surveillance. One activist explained that surveillance is so omnipresent that "a lot of us have just become used to being surveilled by the government," which

sometimes causes activists, to "scale[] back their engagement in response to the surveillance."[57]

Regardless of the organization's political views, existing literature shows just how extensive the chilling effects of unbridled government surveillance can be on political thought and expression. Researchers have long studied the "spiral of silence," defined as "the significant chilling effect on an individual's willingness to publicly disclose political views when they believe their views differ from the majority."[58] In a study of Facebook users, participants were made aware of NSA monitoring and then asked if or how they would engage with Facebook content about several minority political opinions. "The study showed that people who are aware of government surveillance and support it are significantly less likely to speak out when their views differ from what they perceive to be the majority opinion."[59] Similarly, a Wikipedia study found a thirty-percent decrease in user traffic to pages containing certain controversial keywords following the disclosure of the NSA PRISM program by Edward Snowden. These findings both support

---

[57] Speri, *supra* note 23.

[58] Jennifer Lynch, *Face Off: Law Enforcement Use of Facial Recognition Technology*, ELECTRONIC FRONTIER FOUNDATION 9 (Feb. 12, 2018), https://www.eff.org/files/2018/02/15/face-off-report-1b.pdf.

[59] Karen Gullo, *Surveillance Chills Speech—As New Studies Show—And Free Association Suffers*, ELECTRONIC FRONTIER FOUNDATION (May 19, 2016), https://www.eff.org/deeplinks/2016/05/when-surveillance-chills-speech-new-studies-show-our-rights-free-association.

"the existence of an immediate and substantial chilling effect" and have "implications for the health of democratic deliberation among citizens."[60]

Government surveillance additionally has a "conforming effect" on political activity that weaken democracy.[61] Surveillance often dissuades people from joining minority political groups, increases "anxiety and unease," encourages "cognitive dissonance in those who self-censor," and "weakens minority influence."[62] Together these effects demonstrate that "surveillance encourages a less reasoned majority rule."[63] Further, "the formation and reformation of political preferences . . . requires the opportunity to experiment with self-definition in private."[64] However, "pervasive monitoring of every first move or false start will, at the margin, incline choices toward the bland and the mainstream."[65] This marginal, yet important shift is a suppression of individuals ability to engage with minority politics in private spaces.

---

[60] *Id.*

[61] Kaminski and Witnov, *supra* note 41, at 465.

[62] *Id.* at 499–500; *also see Id.* at 500–509 (provides a full explanation of how all four of these effects chill political engagement).

[63] *Id.*

[64] Julie E. Cohen, *Examined Lives: Informational Privacy and the Subject as Object*, 52 STAN. L. REV. 1373, 1426 (2000).

[65] *Id.*

The increasing power of modern surveillance technology only exacerbates this "conforming effect," further muting political expression and association. "Dissenters might be subject to negative repercussions if they can be easily identified using [FRT]. And, based on current technology, over time these burdens would disproportionately fall on minorities."[66] The integration of body-worn cameras with data analysis technology means minority communities only have more reason to fear surveillance and experience chilling effects. Knowing that there could be recording devices hidden in private spaces, that anyone could be an undercover agent or informant, and that anything captured surreptitiously can be extensively analyzed is the very kind of privacy invasion that would affect anyone's willingness to speak out on controversial topics or associate freely with individuals of their choosing.

## IV. The Court Must Interpret Fourth Amendment Doctrine to Require a Warrant for Searches Involving Surreptitious Video Recording to Protect Against First Amendment Injuries.

Prior to recent substantial developments in technology, law enforcement surveillance was inherently constrained by practical limitations. *Jones*, 565 U.S. at 416 (Sotomayor, J., concurring); *Id.* at 428 (Alito, J., concurring). However, unprecedented technological advances have fundamentally changed law

---

[66] Katelyn Ringrose, *Law Enforcement's Pairing of Facial Recognition Technology with Body-Worn Cameras Escalates Privacy Concerns*, 105 V.A. L. REV. 57, 63 (2019).

enforcement surveillance. Not only do officers have access to powerful and affordable recording technology, but they also can efficiently and effectively utilize the collected data for a wide range of purposes. Today, technology makes "available at a relatively low cost such a substantial quantum of intimate information about any person whom the government, in its unfettered distraction, chooses to track," which has the potential to "alter the relationship between citizen and government in a way that is inimical to democratic society." *Id.* at 416 (Sotomayor, J., concurring) (citations omitted).

These technological developments jeopardize individuals' Fourth Amendment rights inside private spaces such as homes or places of worship. Video and audio data can easily and surreptitiously be procured from such spaces and used for a wide range of invasive purposes. Even when someone invites another into their private space, they do not "expect that their movements will be recorded and aggregated in a manner than enables the government to ascertain, more or less at will, their political and religious beliefs, sexual habits, and so on." *Jones*, 565 U.S. at 416 (Sotomayor, J., concurring). Thus, this Court must apply Fourth Amendment doctrine to adequately account for developing surveillance technology's "power . . . to shrink the realm of guaranteed privacy." *Kyllo v. United States*, 533 U.S. 27, 34 (2001).

Specifically, because minority religious and political communities are so often the targets of law enforcement surveillance, the Court must consider the chilling impact technology has on First Amendment-protected expression and avoid making Fourth Amendment rulings that would fail to deter, or even encourage, that chilling effect. Modern video surveillance captures much more detail than an officer's eyes ever could. Consequently, even situations like the facts of this case that, at first blush, do not seem to infringe on First Amendment rights, carry substantial risk of enshrining rules that provide law enforcement with unfettered access to the very kind of private information the First Amendment was designed to protect. It is thus imperative that the Fourth and First Amendments be considered together to ensure the government cannot violate associational and expressive freedoms without adequate individualized suspicion.

**A. The Fourth Amendment Warrant Requirement Must be Applied with "Scrupulous Exactitude" In Order to Protect Individual Liberties and Ensure Government Searches Do Not Exceed the Scope of Their Justifications.**

The Framers designed the First Amendment to protect individuals' freedom to speak, join groups, practice religion, and engage in political discourse even if their views, words, or practices are unpopular. The Fourth Amendment was designed to safeguard individuals from government intrusion into private spaces. Importantly, the very practices protected by the First Amendment often occur inside spaces entitled to Fourth Amendment protections. In the home "all details

are intimate details, because the entire area is held safe from prying government eyes." *Kyllo*, 533 U.S. at 37. Thus, "[w]ith few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Id.* at 31. Further,

> political discourse does not just occur on soapboxes before large crowds; it also thrives in private enclaves between small groups of people. . . . [T]he First Amendment safeguards not just speeches and rallies but *conversations*[] . . . [which] depend upon privacy. Without protection against government probing, countless conversations might never occur or might be carried on in more muted and cautious tones.[67]

As such, the Supreme Court held in *Johnson v. United States* that "[w]hen the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or a Government enforcement agent." 333 U.S. 10, 14 (1948).

Thus, when intrusive surveillance techniques have the capacity to infringe on protected First Amendment rights, the Fourth Amendment warrant requirement "must be applied with scrupulous exactitude." *Zurcher*, 436 U.S. at 564 (internal citation and quotation marks omitted). The "scrupulous exactitude" standard requires the government satisfy "a higher hurdle in the evaluation of reasonableness" under the Fourth Amendment where there is risk of "restraint of the right of expression." *Roaden v. Ky,* 413 U.S. 496, 504 (1973). This heightened

---

[67] Solove, *supra* note 38, at 121–22.

bar is rooted in "the constitutional impossibility of leaving the protection of those freedoms to the whim of the officers." *Stanford v. Texas*, 379 U.S. 476, 485 (1965). Today, the ever-increasing capabilities of technology highlight the importance of applying the "scrupulous exactitude" standard to law enforcement surveillance in presumptively private spaces.

Courts already acknowledge that video surveillance is a particularly intrusive method of searching a private space because it records every detail and retains them indefinitely. *United States v. Koyomejian*, 970 F.2d 536, 551 (9th Cir. 1992) ("video surveillance can result in extraordinarily serious intrusions into personal privacy"). The Fourth Amendment accordingly establishes several requirements for obtaining a warrant for video surveillance to "guard against unreasonable video searches and seizures." *Id.* at 542. In addition to an "ordinary requirement of a finding of probable cause" and exhaustion or proven impossibility of alternative methods, the warrant itself must contain "a particular description" of the activities sought to be recorded, be limited to the minimum possible time frame under thirty days, and "require that the [surveillance] 'be conducted in such a way as to minimize the [videotaping] of [activity] not otherwise subject to the [surveillance.]'" *Id.* (citations omitted). These heightened requirements reflect the immense privacy intrusions attendant to use of video and other surveillance technology, far beyond those inherent in a standard search. The significant

differences in scope and severity of the intrusion require the conclusion that, in cases like Mr. Esqueda's—where the surveillance occurs inside a private space—the Fourth Amendment requires enforcement of the warrant requirement with "scrupulous exactitude."

**B.** **Courts Must Adapt Fourth Amendment Doctrine to Developments in Surveillance and Data Analysis Technology.**

As surveillance technology becomes more powerful, invasive,[68] and "cheaper and cheaper, Fourth Amendment jurisprudence fails to keep up, and you end up with a cheap and affordable surveillance state where the tools that are being used are massively disproportionate to the harms they're combating."[69] This raises tremendous privacy and civil liberties concerns, as well as profound security risks. Surreptitious recording technology, combined with advanced data analysis and aggregation capabilities, provides law enforcement with a powerful window in the lives of recorded subjects. This has significant implications for First Amendment protected freedoms, as "fear of unauthorized official eavesdropping [must not]

---

[68] Nicole Turner Lee and Caitlin Chin, *Police surveillance and facial recognition: Why data privacy is imperative for communities of color*, BROOKINGS (April 12, 2022), https://www.brookings.edu/research/police-surveillance-and-facial-recognition-why-data-privacy-is-an-imperative-for-communities-of-color/#top14.

[69] Faine Greenwood, *The California City That Sends a Drone Almost Every Time Police Are Dispatched on a 911 Call*, SLATE (May 17, 2021, 9:00 AM), https://slate.com/technology/2021/05/chula-vista-police-drone-program.html (quoting Albert Fox Cahn).

deter vigorous citizen dissent and discussion … in private conversation. For private dissent, no less than open public discourse, is essential to our free society." *United States v. U.S. Dist. Court (Keith)*, 407 U.S. 297, 314 (1972).

Importantly, the Supreme Court has acknowledged that courts can and "must take account of more sophisticated systems that are already in use or in development" in applying Fourth Amendment doctrine. *Kyllo*, 533 U.S. at 36. This is a necessary safeguard to ensure new, powerful technology does not undermine the "degree of privacy against government that existed when the Fourth Amendment was adopted." *Id*. at 34. More recently, in *Riley v. California*, the Court ruled that a warrant is required to search someone's smartphone because phones are "a pervasive and insistent part of daily life . . . unheard of ten years ago." 134 S.Ct. 2473, 2484 (2014). In *Carpenter v. United States*, the Court reiterated that it must "contend with the seismic shifts in digital technology" that have the newfound ability to allow law enforcement to be "ever alert" and access a "nearly infallible" memory. 138 S.Ct. 2206, 2219 (2018). Courts are therefore "obligated—as subtler and more far-reaching means of invading privacy have become available to the Government—to ensure that the 'progress of science' does not erode Fourth Amendment protections." *Id* at 2223. Faithful application of precedent compels the Court to respond to developing technology by enforcing the

warrant requirement with "scrupulous exactitude" where new surveillance technology risks infringements of First Amendment rights.

### C. The Constitution Requires a Warrant Where Surreptitious Video Recording in Private Spaces Threatens First Amendment Freedoms.

To adequately safeguard the very private expression and associational freedoms the First Amendment was founded to protect, it is paramount this Court holds that, under the common law trespass theory of Fourth Amendment reasonableness recognized, a warrant is necessary for law enforcement to covertly record in a private space. *See Jones*, 565 U.S. 400; *Florida v. Jardines*, 569 U.S. 1 (2013). Because much of modern electronic surveillance "proceeds surreptitiously, it evades the ordinary checks that constrain abusive law enforcement practices." *Jones*, 565 U.S. at 416. For law enforcement to have appropriate "checks" in an era of invasive surveillance technology used disproportionately on minority communities, the Fourth Amendment warrant requirement must be enforced with "scrupulous exactitude." Making searches of private spaces that utilize surveillance technology contingent on a warrant would ameliorate the risk of First Amendment infringement.

Importantly, requiring a warrant for law enforcement to use surveillance technology to covertly record private spaces and interactions would not hamstring

criminal investigations.[70] The Fourth Amendment has long required warrants in innumerable situations at no detriment to law enforcement's ability to do their job, and, since federal warrants issued annually between 2000 and 2022 have remained fairly stable, modern Fourth Amendment doctrine does not seem to have changed this.[71] As such, enforcing the warrant requirement with "scrupulous exactitude" for surveillance technology use inside private spaces would cause no perceptible harm and would serve the important role of safeguarding protected First Amendment rights.

## CONCLUSION

Based on the foregoing, *Amici* respectfully request this Court reverse the decision below.

---

[70] Theodore Claypoole, *A Clear Solution to Police Surveillance Creep: Warrants Needed for Biometric Analysis*, A.B.A. BUS. LAW TODAY (Aug. 3, 2020), https://www.americanbar.org/groups/business_law/publications /blt/2020/08/police-surveillance/ (explaining the ease, practicality, and foundational necessity of law enforcement officers receiving warrants for protected Fourth Amendment searches).

[71] *How Often Do the FBI and Department of Justice Seek Search Warrants and Subpoenas?*, SYRACUSE UNVIERSITY: TRANSACTIONAL RECORDS ACCESS CLEARINGHOUSE (Aug. 22, 2022), https://trac.syr.edu/immigration/reports/693/.

Date: February 14, 2023      ACLU FOUNDATION OF SOUTHERN CALIFORNIA

ACLU OF FOUNDATION OF NORTHERN CALIFORNIA

By:   /s/ Mohammad Tajsar[72]

Attorney for *Amici Curiae* ACLU California Affiliates

---

[72] This brief was authored primarily by Rachel Marandett, a second-year law student at New York University School of Law and former legal intern for the ACLU of Southern California, under the supervision of undersigned counsel.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-50170

I am the attorney or self-represented party.

**This brief contains** | 6,850 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [        ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Mohammad Tajsar | **Date** | February 14, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*